OPINION
{¶ 1} Appellants, R.R., James Holmes, and S.R., appeal from the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating parental rights and awarding permanent custody of B.R., V.R., and S.R., to Franklin County Children Services ("FCCS"). Because we find no reversible error, constitutional or otherwise, we affirm.
 {¶ 2} Three children are involved in this matter: B.R. (date of birth May 31, 1997), V.R. (date of birth March 14, 2000), and S.R. (date of birth November 23, 2001). R.R. ("Rebekah") is the mother of all three children. Eugene Troutman is the alleged father of B.R. Mr. Troutman did not participate in any of the proceedings either in the trial court or on appeal. Curtis New, also known as Curtis R. ("Curtis"), is the father of V.R., and James Holmes ("James") is the father of S.R.
 {¶ 3} After the trial court rendered its decision, five notices of appeal were filed and consolidated for review. Rebekah filed a notice of appeal concerning S.R., and a notice of appeal concerning B.R. and V.R. James filed a notice of appeal concerning S.R. Counsel was appointed to all three children, and S.R., through counsel filed a notice of appeal. B.R. and V.R. also filed a notice of appeal, however, after conferring with the children, their counsel moved to dismiss their action. Said motion was granted by this court on July 17, 2006, leaving four notices of appeal for our review.
 {¶ 4} Rebekah and Curtis were married in June 1999. On September 11, 2000, a complaint was filed alleging dependency in regard to B.R. and V.R., due to allegations of Rebekah and Curtis having sexual relations in front of the children and sexual contact or conduct by the children. Both children were adjudicated dependent, and temporary custody was granted to FCCS on October 13, 2000.
 {¶ 5} A little over one year later, S.R. was born to Rebekah and James, who voluntarily gave FCCS custody of S.R. A complaint alleging dependency in regard to S.R. was filed on March 15, 2002. On April 11, 2002, just prior to turning six months old, S.R. was adjudicated dependent, and temporary custody was granted to FCCS.
 {¶ 6} Curtis returned to Ohio, after being released from prison in West Virginia in January 2003, and began living with Rebekah's mother. In April 2003, B.R. and V.R. were returned to Rebekah on the condition that Curtis have no contact with B.R., and have only supervised visitation with V.R. At this time, S.R. was with Rebekah for four days a week, but had not yet been returned to her full-time. However, on October 3, 2003, the children were removed from Rebekah after Curtis reported that the children had stayed overnight at his house on several weekends. FCCS filed a motion for temporary court commitment alleging that Rebekah violated the court's order by allowing both B.R. and V.R. to stay with Curtis unsupervised. Said motion was granted by the trial court on December 5, 2003.
 {¶ 7} On December 19, 2003, FCCS filed a motion for permanent custody of B.R., V.R., and S.R., pursuant to R.C. 2151.413. Incorporated in the motion was the affidavit of Kara Fanaff ("Fanaff"), the FCCS social worker assigned to the family, who stated Rebekah has failed to utilize resources made available to her for the purpose of changing parental conduct to allow her to resume and maintain parental duties. Further, Fanaff stated that Rebekah had failed to protect her children from an alleged sexual perpetrator, and that she allowed the alleged perpetrator to be with the children without agency supervision despite a court order prohibiting such contact. Before the court held a hearing on the permanent custody motion, Rebekah moved the court to address a number of constitutional issues, to dismiss the permanent custody motion, and to grant a planned permanent living arrangement ("PPLA"). Hearings regarding these motions were held on November 30, 2004, April 26-28, 2005, August 31, 2005, September 13-14, 2005, October 4, 2005, November 4, 2005, and November 15, 2005.
 {¶ 8} The trial court denied Rebekah's motion regarding the constitutional issues at the hearing on November 30, 2004, and denied her motion to dismiss at the hearing on April 26, 2005. Based on the evidence adduced from the hearings, the trial court concluded that (1) the children had been in the custody of FCCS for 12 months of a consecutive 22-month period, and (2) that placing the children in the permanent custody of FCCS and terminating parental rights was in the best interests of the children.[1]
 {¶ 9} Appellants, Rebekah, James, and S.R., have appealed the trial court's order granting permanent custody of the children to FCCS. Rebekah assigns the following 13 assignments of error:
I. The Trial Court erred in failing to apply the strict scrutiny analysis as mandated under the United States and Ohio Constitutions in contravention of Troxel v. Granville (2000),530 U.S. 57, 65-66; Harrold v. Collier, 107 Ohio St.3d 44, 50,2005-Ohio-5334, ¶ 39-40 (Mandating Strict Scrutiny analysis when the challenged legislation impinges upon the fundamental constitutional right "of parents to make decisions concerning the care, custody, and control of their children." Troxel,530 U.S. at 66); Clark v. Jeter (1988), 486 U.S. 456, 461; Sorrell v.Thevenir (1994), 69 Ohio St.3d 415, 423, * * * and further in violation of Appellant's fundamental rights pursuant to the First
and Ninth Amendments of the United States Constitution and the Ohio Constitution, Article I, Sections One, Three, and Twenty and the Due Process and Equal Protection provisions of the United States and Ohio Constitutions with regard to the following grounds: (1) Denial of Appellant's fundamental expression of speech and right of association; (2) Denial of Substantive Due Process; (3) Fundamental Unfairness; and (4) Denial of equal protection of the laws.
II. The Trial Court erred in applying R.C. 2151.414(B)(1)(a) rather than solely R.C. 2151.414(B)(1)(d) as set forth in Appellee/FCCS's PCC motions in contravention of In re: C.W.,104 Ohio St.3d 163, 167, 2004-Ohio-6411, ¶ 23-24, and In re:Damron, Franklin App. No. 03AP-419, p. 5, 2003-Ohio-5810, ¶ 9 ("The plain language of R.C. 2151.414(B)(1)(a) reveals that this subsection is only triggered when none of the three subsections are triggered.") and further in violation of Appellant's fundamental rights pursuant to the First and Ninth Amendments of the United States Constitution and the Ohio Constitution, ArticleI, Sections One, Three, and Twenty and the Due Process andEqual Protection provisions of the United States and Oho Constitutions with regard to the following grounds: (1) Denial of Appellant's fundamental expression of speech and right of association; (2) Denial of substantive due process; (3) Fundamental unfairness; and (4) Denial of the equal protection of the laws.
III. The Trial Court erred in denying Appellant's motion to dismiss Appellee/FCCS's PCC motion filed December 19, 2003 under Case No. 00JU-10118 (In re: B.R. in contravention of In Re:C.W., 104 Ohio st.3d 163, 167, 2004-Ohio-6411, ¶ 22-23, and further in violation of Appellant's fundamental rights pursuant to the First and Ninth Amendments of the United States Constitution and the Ohio Constitution, Article I, Sections One, Three, and Twenty and the Due Process and Equal Protection
provisions of the United States and Ohio Constitutions with regard to the following grounds: (1) Denial of Appellant's fundamental expression of speech and right of association; (2) Denial of substantive due process; (3) Fundamental unfairness; and (4) Denial of the equal protection of the laws.
IV. The Trial Court erred in not declaring R.C.2151.414(B)(1)(d), facially and as applied to Appellant, unconstitutional and therefore void under the United States and Ohio Constitutions * * * on the basis that the statutory provision creates an irrebuttable presumption of parental unfitness in violation of Appellant's fundamental rights pursuant to the First and Ninth Amendments of the United States Constitution and the Ohio Constitution, Article One, Bill of Rights, Sections One, Three and Twenty and the Due Process and Equal Protection provisions of the United States and the Ohio Constitutions with regard to the following grounds: (1) Vagueness and Overbroad; (2) Denial of Appellant's fundamental expression of speech and right of association; (3) Denial of Substantive Due Process; (4) Fundamental Unfairness; and (5) Denial of the equal protection of the laws.
V. The Trial Court erred in denying Appellant's Motion for Permanent Plan Living Arrangement ("PPLA") in light of In re:A.B. (Ohio App. 9th Dist.), 2005 WL 2291869, 2005-Ohio-4936, p. 4-7, ¶ 22-41; further in contravention of R.C. 2151.415; and further in violation of Appellant's fundamental rights pursuant to the First and Ninth Amendments of the united States Constitution and the Ohio Constitution, Article I, Sections One, Three, and Twenty and the Due Process and Equal Protection
provisions of the United States and Ohio Constitutions with regard to the following grounds: (1) Denial of Appellant's fundamental expression of speech and right of association; (2) Denial of substantive due process; (3) Fundamental unfairness; and (4) Denial of the equal protection of the laws.
VI. The Trial Court erred in denying Appellant's Motion for Permanent Plan Living Arrangement ("PPLA") in violation of Appellant's fundamental rights pursuant to the First andNinth Amendments of the United States Constitution and the Ohio Constitution, Article I, Sections One, Three, and Twenty and theDue Process and Equal Protection provisions of the United States and Ohio Constitutions with regard to the following grounds: (1) Denial of Appellant's fundamental expression of speech and right of association; (2) Denial of substantive due process; (3) Fundamental unfairness; and (4) Denial of the equal protection of the laws.
VII. The Trial Court erred in terminating Appellant's parental rights in that R.C. 2151.413 and 2151.414, facially and as applied to Appellant, are unconstitutional and therefore void on the basis that the statutory provisions create discriminate classifications, those who suffer the loss of their children to permanent custody and those who retain their rights under R.C.2151.413 and 2151.414 as well as other parents who in custodial proceedings, i.e., Title 31 of the Ohio Rev. Code, maintain their parental rights even in the extreme circumstance of parental unfitness, with disproportionate treatment that do not meet the stringent requirements of the Strict Scrutiny test pursuant toTroxel v. Granville, (2000), 530 U.S. 57, and Harrold v.Collier, 107 Ohio St.3d 44, 50, 2005-Ohio-5334, ¶ 39-40 in violation of the First, Ninth, and Fourteenth, both Due Process and Equal Protection Clauses, Amendments of the United States Constitution and Sections One, Two, Three, Sixteen, and Twenty of the Ohio Constitution, Article One, Bill of Rights, on the following grounds: (1) Violation of Appellant's freedom of expression and right of association; (2) "per se" overbroad; (3) Arbitrary, invidious discriminatory, and capricious; (4) Denial of Substantive Due Process; (5) Fundamental Unfairness; and (6) Denial of the equal protection of the laws.
VIII. The Trial Court erred in not declaring R.C.2151.414(D)(1) * * * facially and as applied to Appellant, unconstitutional and therefore void under the United States and the Ohio Constitutions in that the statutory provisions as to the emphasized language is immaterial and irrelevant, is arbitrary, capricious, and invidious, is contrary to and inconsistent with the Court's mandate in Troxel v. Granville, (2000),530 U.S. 57, that parental rights to raise their children is fundamental to all other asserted rights, and further is "Per se" overbroad in violation of the First, Ninth, and Fourteenth, both Due Process and Equal Protection Clauses, Amendments of the United States Constitution and Sections One, Two, Three, Sixteen, and Twenty of the Ohio Constitution, Article One, Bill of Rights, on the following grounds: (1) Violation of Appellant's freedom of expression and right of association; (2) "Per Se" Overbroad; (3) Denial of Substantive Due Process; (4) Fundamental Unfairness; and (5) Denial of the equal Protection of the laws.
IX. The Trial Court erred in finding that an award of permanent custody was in the best interest of the children pursuant to R.C.2151.414(D) and further as amplified by In re: Swisher,
Franklin App. Nos. 03AP-1408 and 03AP-1409, 2003-Ohio-5446.
X. The Trial Court erred in terminating Appellant's parental rights in that (1) the Trial Court failed to make an express finding of parental unfitness regarding Appellant and further (2) FCCS failed to overcome the presumption that Appellant is a fit parent pursuant to Troxel v. Granville, (2000), 530 U.S. 57,65-66, 68-69, and further (3) in violation of Appellant's fundamental rights pursuant to the First and Ninth Amendments of the United States Constitution and the Ohio Constitution, ArticleOne, Bill of Rights, Sections One, Three and Twenty and the Due Process and Equal Protection provisions of the United States and the Ohio Constitutions with regard to the following grounds: (1) Denial of Appellant's fundamental expression of speech and right of association; (2) Denial of Substantive Due Process; (3) Fundamental Unfairness; and (4) Denial of the equal protection of the laws.
XI. Trial Court erred in terminating Appellant's parental rights in regard to Appellant's child in violation of this Honorable Court's mandate set forth in In the Matter of Gibson,McGraw (July 19, 1979), Nos. 78AP-856, 857, unreported (1979 Opinions 2005) and further in violation of Appellant's fundamental rights pursuant to the First and Ninth Amendments of the United States Constitution and the Ohio Constitution, ArticleOne, Bill of Rights, Sections One, Three and Twenty and the Due Process and Equal Protection provisions of the United States and the Ohio Constitutions with regard to the following grounds: (1) Denial of Appellant's fundamental expression of speech and right of association; (2) Denial of Substantive Due Process; (3) Fundamental Unfairness; and (4) Denial of the equal protection of the laws.
XII. The decisions of the Trial Court are against the manifest weight of evidence in accordance with the Due Process and Equal Protection provisions of the United States and the Ohio Constitutions in light of Troxel v. Granville (2000),530 U.S. 57.
XIII. The decisions of the Trial Court are not supported by sufficient probative evidence in accordance with the Due Process and Equal Protection provisions of the United States and the Ohio Constitutions in light of Troxel v. Granville (2000),530 U.S. 57.
 {¶ 10} James assigns the following two assignments of error:
Assignment of error one:
The court erred in finding that R.C. 2151.414 is constitutional.
Assignment of error two:
The decision to terminating the parental rights of James Holmes is against the manifest weight of the evidence.
 {¶ 11} S.R. assigns the following single assignment of error:
The trial court erred in granting permanent custody of S.R. to Franklin County Children Services.
 {¶ 12} All of Rebekah's thirteen assignments of error allege, in some fashion, a deprivation of her constitutional right to rear her children. At the outset, we recognize that parents have a constitutionally protected fundamental interest in the care, custody, and management of their children. Troxel v. Granville
(2000), 530 U.S. 57, 120 S.Ct. 2054; Santosky v. Cramer (1982),455 U.S. 745, 102 S.Ct. 1388. The Supreme Court of Ohio has recognized the essential and basic rights of a parent to raise his or her child. In re Murray (1990), 52 Ohio St.3d 155. Such rights, however, are not absolute. In re B.L., Franklin App. No. 04AP-1108, 2005-Ohio-1151. A parent's natural rights are always subject to the ultimate welfare of the child. In reCunningham (1979), 59 Ohio St.2d 100, 106; In re B.L., at ¶ 7. Thus, although a parent has a constitutionally protected right to rear his or her child, such right may be terminated when necessary for the best interest of the child. Id. Accordingly, "because Ohio's statutory scheme reconciles a parent's constitutional right with the state's parens patriae interest in providing for the security and welfare of children under its jurisdiction," it does not unconstitutionally deprive Rebekah or James of their parental rights. In the Matter of S.W., Franklin App. No. 05AP-1368, 2006-Ohio-2958 at ¶ 7, citing In reThompson (Apr. 26, 2001), Franklin App. No. 00AP-1358 ("Thompson I"); In re Thompson, Franklin App. No. 02AP-557, 2003-Ohio-580, at ¶ 22 ("Thompson II").
 {¶ 13} In the interest of clarity, we address Rebekah's assignments or error out of order. Because a number of Rebekah's assignments of error contest the constitutionality of various statutory provisions that govern permanent custody proceedings, we begin our analysis with the principle that statutes carry a strong presumption of constitutionality. Harrold v. Collier,107 Ohio St.3d 44, 2005-Ohio-5334. The party challenging the statutes bears the burden of proving that the legislation is unconstitutional beyond a reasonable doubt. Id.
 {¶ 14} In her fourth assignment of error, Rebekah asserts that the trial court erred in failing to declare R.C.2151.414(B)(1)(d) unconstitutional because it creates an irrebuttable presumption of parental unfitness, and includes this presumption in determining the best interests of the child. James also makes this argument in his first assignment of error. However, this court has recently considered and rejected such argument and held that R.C. 2151.414(B)(1)(d) is constitutional on its face. See In re S.W., supra. See, also, In re Abram,
Franklin App. No. 04AP-220, 2004-Ohio-5435; In re Bray,
Franklin App. No. 04AP-842, 2005-Ohio-1540; In re Brooks,
Franklin App. No. 04AP-164, 2004-Ohio-3887. Other appellate districts have found likewise. See, e.g., In re Workman, Vinton App. No. 02CA574, 2003-Ohio-2220; In re Villaneuva/HamptonChildren, Stark App. No. 2004CA00120, 2004-Ohio-4609; In reGomer, Wyandot App. No. 16-03-19, 2004-Ohio-1723. Given this court's precedent, we find that R.C. 2151.414(B)(1)(d) is not unconstitutional. Accordingly, Rebekah's fourth assignment of error, and James' first assignment of error are overruled.
 {¶ 15} Regarding Rebekah's seventh, eighth, and eleventh assignments of error, this court has recently reviewed, and rejected, similar arguments contained in In the Matter of B.L.
The conclusions of In the Matter of B.L., regarding the constitutional arguments advanced in Rebekah's seventh, eighth, and eleventh assignments of error, were reiterated, in In theMatter of S.W. We find no reason to diverge from this court's precedent. Accordingly, Rebekah's seventh, eighth, and eleventh assignments of error are overruled.
 {¶ 16} In her first assignment of error, Rebekah contends that the trial court erred in failing to apply a strict scrutiny analysis in reviewing her constitutional challenges. Because the challenged legislation concerns a fundamental right of parents to make decisions concerning the care, custody, and control of their children, Rebekah argues that the legislation must be reviewed under a strict scrutiny analysis. Under the strict scrutiny standard, a statute that infringes on a fundamental right is unconstitutional unless the statute is narrowly tailored to promote a compelling governmental interest. Collier, supra.
 {¶ 17} Based on the record in this case, we cannot say that the trial court failed to apply a strict scrutiny analysis. The trial court denied Rebekah's motion concerning her constitutional challenges in an oral decision, and did not mention the test it utilized. Further, like the appellants in B.L. and S.W.,
Rebekah offers no rationale for why these statutes fail under a strict scrutiny test. Unsupported assertions of unconstitutionality are insufficient to satisfy an appellant's burden, particularly in light of the well-recognized presumption of constitutionality. Id. Additionally, this court has found the challenged statutes to be constitutional. Accordingly, Rebekah's first assignment of error is overruled.
 {¶ 18} In her third assignment of error, Rebekah contends that the trial court erred in denying her motion to dismiss because the children, B.R. and V.R., were not in temporary custody for 12 months when FCCS filed its permanent custody motion as is required by R.C. 2151.413. B.R. and V.R. were adjudicated dependent on October 13, 2000, and the children were returned to their mother with a court ordered protected supervision ("cops") order on April 22, 2003. On December 5, 2003, pursuant to a motion filed by FCCS, the trial court terminated the cops order to Rebekah, and granted temporary legal custody back to FCCS. According to Rebekah, the permanent custody motion filed on December 19, 2003, was clearly filed less than 12 months from the date the case plan was adopted on December 5, 2003; and, therefore, the permanent custody motion should have been dismissed pursuant to In re C.W., 104 Ohio St.3d 163,2004-Ohio-6411.
 {¶ 19} We note initially, however, that Rebekah's argument undoubtedly fails with respect to S.R. because FCCS has had temporary custody of him since April 11, 2002, and he has never been returned to his mother's legal custody. R.C. 2151.413 sets forth guidelines for determining when a public children-services agency or private child-placing agency must or may file a motion for permanent custody. Id. at 165. Most relevant to the issue before us is R.C. 2151.413(D)(1), which states, "[i]f a child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, the agency with custody shall file a motion requesting permanent custody of the child."
 {¶ 20} According to In re C.W., "[b]efore a public children-services agency or private child-placing agency can move for permanent custody of a child on R.C. 2151.414(B)(1)(d) grounds, the child must have been in the temporary custody of an agency for at least 12 months of a consecutive 22-month period." Id. at syllabus. The time is calculated from either the time of adjudication or 60 days after removal from the home, whichever is earlier. Id; R.C. 2151.414(B)(1).
 {¶ 21} B.R. and V.R. were adjudicated dependent on October 5, 2000, and the motion for permanent custody was filed on December 19, 2003. Excepting the eight-month period, from April 21, 2003 to December 5, 2003, when the children were returned to their mother, it is clear that the "12 of 22 month" rule is satisfied. While Rebekah contends that the time prior to her having custody as of April 21, 2003, cannot be counted for purposes of calculating the 12 of 22 months, we find no language in either the statute or In re C.W. to support her position. In re C.W.
does not stand for the proposition cited by Rebekah, and the facts in that case are not analogous to those sub judice.
 {¶ 22} In In re C.W., the child entered the temporary custody of Summit County on June 21, 2002, and was adjudicated dependent on July 19, 2002. On April 23, 2003, a motion for permanent custody was filed, leaving only 9 months from the time the child was adjudicated dependent to the time the motion for permanent custody was filed. The Supreme Court of Ohio stated that its inquiry "centers around a determination whether a trial court may count the time between the filing of a motion for permanent custody and the time of the permanent-custody hearing to satisfy the requisite 12-month period of temporary custody set forth in R.C. 2151.414(B)(1)(d)." Id. at 166. The court answered in the negative, and expressed that "the time that passes between the filing of a motion for permanent custody and the permanent-custody hearing does not count toward the 12-month period set forth in R.C. 2151.414(B)(1)(d)." Id. at 168.
 {¶ 23} Contrary to Rebekah's assertion, there is no language in In re C.W. that prohibits looking back to the period of time prior to April 21, 2003, when B.R. and V.R. were returned to her care. Further, the plain language of R.C. 2151.413(D)(1) allows an agency to calculate the period of time a child has been in the temporary custody using any period of a consecutive 22-month period, calculated from the time the child was adjudicated or 60 days after removal of the child from the home. Therefore, the trial court did not err in denying Rebekah's motion to dismiss. Consequently, Rebekah's third assignment of error is overruled.
 {¶ 24} In her second assignment of error, Rebekah contends that the trial court erred in applying both R.C.2151.414(B)(1)(a) and 2151.414(B)(1)(d), when FCCS' permanent custody motion was based solely on R.C. 2151.414(B)(1)(d). It is Rebekah's position that this violated her procedural due process and equal protection rights, and is contrary to In re Damron,
Franklin App. No. 03AP-419, 2003-Ohio-5810.
 {¶ 25} R.C. 2151.414(B)(1)(a) provides, in pertinent part, that the court may grant custody of a child to FCCS if the court determines that "[t]he child is not abandoned or orphaned," does not meet the "twelve out of twenty-two" rule "and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." R.C. 2151.414(B)(1)(d) provides, in pertinent part, that the court may grant custody of a child to FCCS if the court determines that the "twelve out of twenty-two" rule applies.
 {¶ 26} This court stated in In re Damron that because the language in R.C. 2151.414(B)(1)(a) refers to a child that does not meet the requirements of R.C. 2151.414(B)(1)(b), (c), or (d), R.C. 2151.414(B)(1)(a) applies only when none of the remaining three subsections is triggered. In re Damron, at ¶ 9. In that case, we held, in part, that because the facts involved R.C.2151.414(B)(1)(d), i.e., the "twelve out of twenty-two" rule, they did not, and could not, trigger subsection (a); thus the trial court did not need to consider the factors necessary to a determination under R.C. 2151.414(B)(1)(a).
 {¶ 27} Under Rebekah's interpretation of In re Damron, if a trial court finds that R.C. 2151.414(B)(1)(d) is satisfied, then it is prohibited from making a finding that a child cannot be placed with either of the parents within a reasonable time, or should not be placed with the child's parent. We do not agree with Rebekah's interpretation. In re Damron contains no such prohibition, but rather, states that if the facts of a given case trigger subsection (d), then it is unnecessary for the court to analyze whether or not the children could be placed with either of the parents within a reasonable time, or should be placed with either parent, under R.C. 2151.414(B)(1)(a).
 {¶ 28} Further, in the present case, the trial court's decision made the requisite finding that the children were in the custody of FCCS for 12 months of a consecutive 22-month period, and as discussed above, the evidence supports the trial court's findings. Since the motion was brought pursuant to R.C.2151.414(B)(1)(d), the court's holding was premised on R.C.2151.414(B)(1)(d), and the evidence supports the same, we do not find that the trial court violated Rebekah's equal protection and due process rights through its reference to whether or not the children could be placed with the parents. See In re S.W.
Accordingly, Rebekah's second assignment of error is overruled.
 {¶ 29} In her tenth assignment of error, Rebekah asserts that the trial court erred in terminating her parental rights without making an express finding of her parental unfitness. Rebekah also contends that FCCS failed to overcome the presumption that she is a fit parent pursuant to Troxel v. Granville (2000),530 U.S. 57, 120 S.Ct. 2054.
 {¶ 30} As this court has previously stated, "R.C. 2151.414
does not require that a trial court find a parent unfit before it may terminate that parent's parental rights." In the Matter ofB.L., at ¶ 22, citing In re Stillman, 155 Ohio App.3d 333,2003-Ohio-6228; see, also, In the Matter of S.W., at ¶ 27. As in In the Matter of B.L., R.C. 2151.414(B)(1)(d) applied in the instant case, and, thus, the trial court was required to find that the termination of parental rights was in the best interest of the children, and that the "12 out of 22" rule applies. Parental unfitness is not a required finding to terminate parental rights under that section. See Id.
 {¶ 31} Even if such a finding were required, "parental unfitness is inherent in the trial court's finding compliance with the `twelve out of twenty-two' rule." In the Matter ofS.W., at ¶ 28. "A `parent has twelve months to demonstrate that the parent is able, suitable, or fit to care for [a] child. Thus, the parent is not deprived of the ability * * * to demonstrate the parent's ability, suitability, or fitness to care for the child [under R.C. 2151.414(B)(1)(d)].'" Id., quoting In reBrooks, at ¶ 32, quoting In re Gomer, Wyandot App. No. 16-03-19, 2004-Ohio-1723, at ¶ 31. R.C. 2151.414(B)(1)(d) necessarily implies some level of parental unfitness. Consequently, Rebekah's tenth assignment of error is overruled.
 {¶ 32} In her fifth and sixth assignments of error, Rebekah contends that the trial court erred in denying her PPLA motion. Specifically, she argues that pursuant to In re A.B., Summit App. No. 22659, 2005-Ohio-4936, the trial court should order a PPLA because both Rebekah and the children oppose permanent custody to FCCS and a permanent living arrangement is available for the children.
 {¶ 33} R.C. 2151.414(A)(5) provides, in pertinent part, that "[e]xcept for cases in which a motion for permanent custody described in division (D)(1) of section 2151.413 of the Revised Code is required to be made," a public children services agency such as FCCS "that has been given custody of a child pursuant to section 2151.353 of the Revised Code * * * shall file a motion requesting * * * (5) [a]n order that the child be placed in a planned permanent living arrangement." R.C. 2151.353(A)(5) provides that, after the trial court adjudicates a child abused, neglected, or dependent, it may issue one of several enumerated dispositional orders, including permanent custody to a children services agency, or a PPLA. The provision pertaining to placing the child in a PPLA explicitly provides that the court may place the child in a PPLA "if a public children services agency or private child placing agency requests the court to place the child in a planned permanent living arrangement" and if the court finds, by clear and convincing evidence, that a planned permanent living arrangement is in the best interest of the child and that one of three statutory criteria set forth in R.C. 2151.353(A)(5) exists.
 {¶ 34} Despite the express statutory language that authorizes only an agency with temporary custody of a child to file a dispositional motion requesting the court to order the child be placed in a PPLA, the Ninth Appellate District in In re A.B.,
liberally construed the above provisions to give trial courts the authority to consider placing children in a PPLA upon a motion of an agency, another party, a person with legal custody, the guardian ad litem, or even sua sponte, by the court. The Supreme Court of Ohio recently addressed this issue, and reversed the case upon which Rebekah relies. In re A.B.,110 Ohio St. 3d 230, 2006-Ohio-4359. In so doing, the court found that R.C.2151.353(A)(5) is unambiguous and does not authorize a trial court to consider a planned permanent living arrangement unless the children services agency has filed a motion requesting such a disposition. The court stated:
After a public children services agency or private child placing agency is granted temporary custody of a child and files a motion for permanent custody, a juvenile court does not have the authority to place the child in a planned permanent living arrangement when the agency does not request this disposition.
Id. at syllabus.
 {¶ 35} In the case sub judice, FCCS was awarded temporary custody of all three children and filed its permanent custody motion in December 2003. FCCS did not request a PPLA; therefore, the trial court did not have the authority to place the children in a PPLA, and Rebekah's motion was without merit. Accordingly, Rebekah's fifth and sixth assignments of error are overruled.
 {¶ 36} In her remaining assignments of error, namely the ninth, twelfth, and thirteenth, Rebekah contests the evidentiary support of the trial court's judgment terminating parental rights and awarding permanent custody of the children to FCCS. Such arguments are also made in James' second assignment of error, and in S.R.'s single assignment of error. Therefore, said assignments of error will be addressed together.
 {¶ 37} In order to terminate parental rights, the Ohio Revised Code requires that the trial court determine, by clear and convincing evidence, that a grant of permanent custody to the agency that has so moved is in the best interest of the child and that one of four enumerated factors in R.C. 2151.414(B)(1) applies. In re M.B., Franklin App. No. 04AP-755, 2005-Ohio-986. Clear and convincing evidence is that measure of degree of proof, which will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established. Cross v.Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus. It is more than a mere preponderance of the evidence, but does not require proof beyond a reasonable doubt. Id.
 {¶ 38} On appellate review, "[p]ermanent custody motions supported by some competent, credible evidence going to all the essential elements of the case will not be reversed * * * as against the manifest weight of the evidence." In re Brown,
Franklin App. No. 03AP-969, 2004-Ohio-3314, at ¶ 11, citing Inre Brofford (1992), 83 Ohio App.3d 869; In re Abram, supra. Further, in determining whether a judgment is against the manifest weight of the evidence, the reviewing court is guided by the presumption that the findings of the trial court are correct.Brofford, supra, citing Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Id. at 80; In re Abram, supra.
 {¶ 39} R.C. 2151.414(B)(1) governs the determination of termination of parental rights proceedings. R.C 2151.414(B)(1) states:
Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
(b) The child is abandoned.
(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 40} In the present case, to establish one of the enumerated four factors of R.C. 2151.414(B)(1), FCCS relied on subsection (d), the "12 out of 22 month" rule. As we have previously discussed, FCCS was awarded temporary custody of B.R. and V.R. on October 13, 2000, and of S.R. on April 11, 2002. At the time FCCS filed its motion for permanent custody, the children had been in the custody of FCCS for 12 months of a consecutive 22-month period. Therefore, we find that the trial court properly found that the requirement of R.C.2151.414(B)(1)(d) was satisfied.
 {¶ 41} Next, we must resolve whether the determination to award permanent custody is in the children's best interests and is supported by clear and convincing evidence. In determining whether permanent custody is in the best interest of the child, R.C. 2151.414(D) states:
(D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 [2151.35.3] or division (C) of section 2151.415 [2151.41.5] of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
For the purposes of this division, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28
of the Revised Code or the date that is sixty days after the removal of the child from home.
 {¶ 42} A trial court is not required to specifically enumerate each factor under R.C. 2151.414(D) in its decision. Inre Heyman (Aug. 13, 1996), Franklin App. No. 96AP-194. However, there must be some indication on the record that all of the necessary factors were considered. Id.; In re Hershberger,
Allen App. No. 1-04-55, 2005-Ohio-429, at ¶ 28.
 {¶ 43} R.C. 2151.414(D)(1) looks to the interrelationships of a child to his or her parents and other listed persons. The record establishes that Rebekah has a relationship with all three of her children and that S.R. has a relationship with James. Further, the record demonstrates that the children are very bonded to each other and have a relationship with their foster parents as well. Thus, the evidence is sufficient to support the trial court's determination.
 {¶ 44} R.C. 2151.414(D)(2) addresses the wishes of the child with respect to custody as expressed by the child or the guardian ad litem. At trial, the children expressed their desire to live with their mother. When first interviewed by the trial judge in November 2004, B.R., who was seven at the time, said it would make her "a little sad" if she would not be able to see her real mom or dad again. Later, however, B.R. said she changed her mind about where she wanted to live and indicated that she wanted to live with respite care providers, Beth and Scott. V.R., who at that time was 4-years old, said that she would "die" if she were adopted, but she was unable to elaborate about what she meant by that, because later she said, "I died." "Before [B.R.] died. Before." S.R., who was 3-years old, became uncomfortable and left the room without saying anything.
 {¶ 45} The children were interviewed again on November 15, 2005. B.R., who was now age eight, clearly expressed her desire to live with her mother. B.R. stated that she liked James, but that she feared Curtis. B.R. described that she did not like it when Curtis watched them while her mother was elsewhere and she did not like his relationship with her maternal grandmother. B.R. thought that if she went to live with Rebekah, she would also be living with James, V.R. and S.R.B.R. was receptive to being adopted by her care providers if she could not live with her mother. B.R. also expressed her desire to stay with her brother and sister, and her worry of not being there to watch out for her sister.
 {¶ 46} V.R., was five at this time, and indicated that she enjoyed visits with her mother and James, who she referred to as "daddy." She also indicated that she would like to live with them. V.R. expressed that it would be "fun" to live with Rebekah because her mom has a swimming pool. V.R. discussed things that her mother told her she would do with the children, such as let them play in the pool and take them to the park. S.R., who was age four at this time, was not brought to trial and was for the most part unable to express himself on the subject of adoption.
 {¶ 47} The guardian ad litem is in favor of the motion for permanent custody for all three children. Given the testimony of the children, coupled with the guardian ad litem's recommendation, the court had sufficient evidence under this factor to support its determination.
 {¶ 48} R.C. 2151.414(D)(3) addresses a child's custodial history. S.R., by agreement, entered FCCS care two days after he was born, and has never been returned home. Except for the almost eight-month period in 2003 when they lived with Rebekah, B.R. and V.R. have been in the care of FCCS since October 2000, having been removed from the home at age three years, and age three months, respectively. The children's custodial history weighs in favor of the court's determination.
 {¶ 49} R.C. 2151.414(D)(4) considers the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to FCCS. B.R. has been in the custody of FCCS for over half of her life, and V.R. and S.R. have been in the custody of FCCS for essentially their entire lives. The opportunity to remedy the issues that caused the children to be removed from the home has been available to Rebekah and James, but to no avail.
 {¶ 50} It is clear from the record that since FCCS became involved with the family, the parents have failed to establish a stable and safe home and income sufficient to meet the children's needs. B.R. and V.R. were taken from Rebekah and Curtis' care in October 2000, due to allegations of abuse and dependency. In November 2001, S.R. was born to Rebekah and James, and pursuant to a voluntary agreement, S.R. entered FCCS care at the time of his birth. There was a period in which Rebekah and James were complying with the case plan and B.R. and V.R. were returned to Rebekah in April 2003. In January of that year, however, Curtis returned to Ohio after being released from prison in West Virginia. Upon his return, he began residing with Rebekah's mother. Because of concerns with Curtis and the children, when B.R. and V.R. were returned to Rebekah in April 2003, there was an order from the court that V.R. have no contact with Curtis and that B.R. have only supervised visitation with him.
 {¶ 51} However, the record reflects Rebekah violated the court's order and the children were permitted unsupervised visitation with Curtis. Rebekah testified that Curtis would not be at her mother's house when she dropped the kids off, but he would apparently return after Rebekah left. Curtis, however, testified that Rebekah let him see the children and that he paid Rebekah $25 to keep the girls on the week-ends. According to Curtis, he was even in the Rebekah's home during some of FCCS' visits, once hiding in the closet and once hiding under Rebekah's bed. Curtis also described a period of time when he lived with Rebekah and James while Rebekah tried to make up her mind about whom she wanted to be with. Curtis described various sexual encounters with Rebekah, both prior to, and during the time he was living there, some involving James as well. Curtis testified about being mentally ill and having a multiple personality named Jake who does bad things and comes out when Curtis is upset or feels threatened. Rebekah and Curtis are still married and it is unclear from the record whether or not a divorce action is pending.
 {¶ 52} According to Rebekah, she has lived in at least ten different places since 2004, and she has been unable to maintain employment. She has been employed briefly at Volunteers of America, Sav-A-Lot grocery, Johnny Rockets, and a hotel, but had to leave when the jobs became too difficult or when problems arose with the other staff. Rebekah is borderline mentally retarded and receives public assistance. Though unemployed, she testified that she is looking for work. Rebekah was living with James at the beginning of the trial, but at the conclusion, she testified she is living alone at 125 Dakota, where she had been for the previous two months. Rebekah stated she is seeking a divorce from Curtis, and she would keep Curtis away from her children and out of her life if they were returned to her. However, the landlord, Mr. Burman, testified the named tenant on the lease at 125 Dakota is Curtis, and Rebekah's signature is on the lease as a witness. According to Mr. Burman, Rebekah lives with Curtis at that address and he has seen them together in that apartment "quite often."
 {¶ 53} James has also failed to maintain stable housing throughout the time FCCS has had custody of S.R. Further, since FCCS' involvement, James has not been able to maintain employment. At the time of trial, he was unemployed, having lost his job at a thrift shop for too many days missed, which he said was due to visiting his children. James testified that he was living with Rebekah and they were sustaining on her income from public assistance, which barely covered their expenses. James and Rebekah had separated on at least two occasions in the previous two years, and at the trial's conclusion had recently separated again. Though there was testimony early in the proceedings when James was living with Rebekah about how they would care for the children if they were returned, there is no evidence concerning James' plans or ability to care for S.R. by himself, now that he is not living with Rebekah.
 {¶ 54} Based on the children's ages, their time spent in FCCS'scustody, and their need for permanency, the trial court found that it was in the children's best interests to award permanent custody to FCCS and facilitate placement for the children. Further temporary custody to FCCS would prolong the process and prevent permanent placement of the children. While it is apparent there is a relationship between Rebekah, and James and the children, and there have been attempts at compliance with the case plan, there is no question that in the years these children have spent in foster care, neither Rebekah, nor James, has remedied the situation that caused the removal of the children. In fact, the evidence demonstrates that the circumstances have not changed since the filing of the PCC motion in December 2003, up to the trial's conclusion in November 2005. We find the trial court had sufficient evidence to find by clear and convincing evidence that B.R.'s, V.R.'s and S.R.'s best interests are served by placing them in the permanent custody of FCCS to facilitate permanent placement for them. We also find that the evidence supporting the trial court's decision is not against the manifest weight of the evidence. Accordingly, Rebekah's ninth, twelfth, and thirteenth assignments of error are overruled, James' second assignment of error is overruled, and S.R.'s single assignment of error is overruled.
 {¶ 55} Having overruled all the asserted assignments of error advanced by the appellants, the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is hereby affirmed.
Judgment affirmed.
Klatt, P.J., and Petree, J., concur.
[1] Rebekah states in her brief that the trial court did not rule on her motion for a PPLA. Contrary to her assertions, however, the trial court's December 5, 2005 judgment entry finds that the circumstances in this case do not meet the statutory criteria for a PPLA, and states in relevant part, "IT IS THEREFORE ORDERED * * *. Deny the Alternative Motion for Planned Permanent Living Arrangement filed November 14, 2005." (Id. at 7.)