[Cite as *In re I.J.H.*, 2023-Ohio-941.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| | | No. 22AP-332 |
| [I.J.H.] et al., | : | (C.P.C. No. 18JU-9119) |
| (N.W., Mother, | : | (REGULAR CALENDAR) |
| Appellant). | : | |
| In the Matter of: | : | |
| | | No. 22AP-333 |
| [I.A.H-W.], | : | (C.P.C. No. 18JU-9117) |
| (N.W., Mother, | : | (REGULAR CALENDAR) |
| Appellant). | : | |

D E C I S I O N

Rendered on March 23, 2023

**On brief:** *William T. Cramer* for appellant.

**On brief:** *Sharon K. Carney* for Franklin County Children Services.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

JAMISON, J.

{¶ 1} Appellant, N.W., appeals from two separate judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting permanent custody of her three minor children, I.J.H., I.M.H., and I.A.H-W. to appellee, Franklin County Children Services ("FCCS"). For the reasons that follow, we affirm.

**I. Facts and Procedural History**

{¶ 2} These cases involve separate appeals from two juvenile court judgments granting Permanent Court Commitment ("PCC"), to FCCS of appellant's three minor children, I.J.H., born December 5, 2013, I.A.H-W., born October 1, 2015, and I.M.H., born December 12, 2016.

{¶ 3} On August 6, 2018, FCCS filed a complaint in case No. 18JU-9117 alleging that I.A.H-W. was an abused child as defined in R.C. 2151.031(C), a neglected child as defined in R.C. 2151.03(A)(2), and a dependent child as defined in R.C. 2151.04(C). The material facts alleged in the complaint are as follows:

> On or about, July 29, 2018, [FCCS] received a referral in regards to the well-being of [I.A.H-W.] and his siblings, [I.J.H.] and [I.M.H.]. [I.A.H-W.] was observed with huge sores down his back, the back of his scrotum, and buttocks crack. His ankles and feet were blistered and oozing puss and as a result, he could barely walk and his injuries smelled like there was an infection. The burns were originally reported to be an allergic reaction but Mother later admitted that her boyfriend, [C.H.], put [I.A.H-W.] in scalding hot water. There are also reports that [C.H.] has tried to light [I.A.H-W.] on fire in the past, has rolled [I.A.H-W.] up in a rug, has taken a baseball bat and hit [I.A.H-W.] in the ribs and on his fingers, and on more than one occasion has picked [I.A.H-W.] up by the arm and dropped him on his head onto the floor.
>
> * * *
>
> At Nationwide Children's Hospital, [I.A.H-W.] was found to have burns on both feet, scrotum, butt crease and buttocks. He also has a linear bruise on his left forearm, a burn under his right eye, bruising on his left cheek, right shin, and right ear. The burns are partial and fully burned through all the layers of the skin. They are infected and he will most likely require skin grafts. [I.A.H-W.] also has T3 and T5 vertebrae compression fractures on his spine from some kind of slamming force.
>
> * * *
>
> Both [C.H.] and Mother repeatedly said they did not know what caused the burns. Mother reported that the water in the shower was not hot enough to cause the burns.
>
> * * *
>
> As of August 2, 2018, caseworker spoke to the detective regarding results of Mother's polygraph test. As they were beginning to ask Mother the same questions a second time

around, she stated she would like to write a statement. Mother reports that she turned on the shower, felt the water, and [I.A.H-W.] got in to wash the feces off of him. [C.H.] then turned the cold water off and only had the hot water on. Mother stated the water was scolding and she saw steam coming from the water. [C.H.] plugged the bathtub to create standing water. Mother reported [I.A.H-W.] was sitting in the bathtub and he was screaming. Mother stated she was "scared to death" and that is why she did not seek help or try to stop [C.H.].

(Aug. 6, 2018 Compl. at 1-2.)

{¶ 4}    On August 6, 2018, FCCS filed a complaint in case No. 18JU-9119, alleging that I.J.H. and I.M.H. were neglected and dependent children.  In addition to the horrific allegations concerning I.A.H-W., the complaint also alleges that "[m]other was asked to bring [I.J.H.] and [I.M.H.] into the hospital as the girls were filthy and [I.J.H.] had bed bug bites on the left side of her upper back." (Compl. at 1.)

{¶ 5}    On December 3, 2018, I.A.H-W. was adjudicated an abused minor in case No. 18JU-9117, and his sisters were adjudicated neglected minors in case No. 18JU-9119.  All three minor children were placed in the temporary custody of FCCS.  They have been in the continuous custody of FCCS since that time.  On August 7, 2018, the juvenile court appointed attorney Suzanne Barker as Guardian ad Litem ("GAL"), for appellant's three minor children.  Case plans were subsequently approved and adopted by the juvenile court and the temporary custody orders were extended on July 30, 2019 and December 17, 2019.  Carol Jacobson was appointed lay GAL on February 28, 2020.  On April 23, 2020, FCCS filed a motion for PCC in each case.

{¶ 6}    On April 12, 2022, the juvenile court held an evidentiary hearing on the PCC motions.  At the permanent custody hearing, the court heard the testimony of appellant, FCCS caseworker Cassandra McKay, lay GAL Carol Jacobson, and foster parent C.D.  On May 12, 2022, the juvenile court issued a judgment entry in case No. 18JU-9119, granting permanent custody of I.J.H. and I.M.H. to FCCS, and a judgment entry in case No. 18JU-9117, granting permanent custody of I.A.H-W. to FCCS.

{¶ 7}    Appellant timely appealed to this court from the May 12, 2022 judgments.

## II.  Assignment of Error

{¶ 8}    Appellant assigns the following error for our review:

> The judgment granting the agency permanent custody and terminating appellant's parental rights was not supported by the weight of the evidence.

## III. Standard of Review

{¶ 9} This court reviews a manifest weight challenge to a juvenile court's judgment granting PCC under the following standard:

> In reviewing a judgment granting permanent custody to FCCS under the manifest weight standard, an appellate court must make every reasonable presumption in favor of the judgment and the trial court's findings of facts. If the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the juvenile court's verdict and judgment. An appellate court will not overturn a permanent custody order when it is supported by competent, credible evidence. (Internal citations and quotations omitted.)

*In re J.R.*, 10th Dist. No. 19AP-228, 2020-Ohio-1347, ¶ 27, quoting *In re E.B.*, 10th Dist. No. 16AP-352, 2017-Ohio-2672, ¶ 19. *See also In re T.L.*, 10th Dist. No. 20AP-591, 2021-Ohio-3221.

## IV. Legal Analysis

### A. Assignment of Error

{¶ 10} In appellant's assignment of error, appellant argues that the award of permanent custody to FCCS is against the manifest weight of the evidence. We disagree.

{¶ 11} "Parents have a basic and fundamental interest of the care, custody, and management of their children." *E.B.* at ¶ 19, citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000). "The Supreme Court of Ohio recognizes that it is the constitutionally protected right of a parent to raise his or her child." *E.B.* at ¶ 19, citing *In re Murray*, 52 Ohio St.3d 155, 157 (1990). *See also In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28. Parental rights are not absolute, however, as they are secondary to the ultimate welfare of the child. *E.B.* at ¶ 19, citing *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 15, citing *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶ 12} Under R.C. 2151.413(D)(1), "if a child has been in the temporary custody of one or more public children services agencies * * * [for] twelve or more months of a

consecutive twenty-two month period, the agency with custody shall file a motion requesting permanent custody of the child." Pursuant to R.C. 2151.414(A)(1), "[t]he court shall conduct a hearing in accordance with section 2151.35 of the Revised Code to determine if it is in the best interest of the child to permanently terminate parental rights and grant permanent custody to the agency that filed the motion."

{¶ 13} R.C. 2151.414(B) sets forth the circumstances under which a court may grant permanent custody of a child to a children services agency such as FCCS. R.C. 2151.414 provides in relevant part as follows:

> (B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
>
> * * *
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * * from home.

{¶ 14} Appellant does not dispute that FCCS has satisfied R.C. 2151.414(B)(1)(d), as all three children have been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period. Thus, the dispositive issue in this appeal is whether the weight of the evidence supports a finding that PCC is in the best interest of appellant's three children.

{¶ 15} R.C. 2151.414(D) provides that in determining what is in the best interest of the child, the court shall consider all relevant factors including, but not limited to, those set forth in R.C. 2151.414(D)(1)(a) through (e):

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period[;] * * *

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in division (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 16} FCCS caseworker, Cassandra McKay, testified that she has been on the case since its inception, and she drafted the case plan for appellant and her three children. She told the juvenile court that her role is to assist parents in completing the case plan with the ultimate goal of reunification. McKay told the juvenile court that she made an effort to engage the children's father, M.H., in the case plan, but that he did not complete the threshold objective of legally establishing paternity of I.J.H. and I.A.H-W. M.H. did not participate in visitation and did not appear at the custody hearing. The juvenile court terminated M.H.'s parental rights to the three children and he is not a party to the appeal.

{¶ 17} According to McKay, the primary objectives of the case plan for appellant included completing a child parenting class, submitting to a domestic violence assessment and following all recommendations, maintaining safe and stable housing, and maintain a legal source of income. The expectations were that appellant would demonstrate she could meet and maintain the needs of the children, ensure that the children attended all necessary appointments and assessments, sign releases for all treatment and service providers, utilize available medical, psychiatric, or psychological resources provided to assist her parenting, meet with the caseworker every 30 days, and visit the children on a regular and consistent basis.

{¶ 18} McKay told the juvenile court that appellant had completed the domestic violence assessment and the parenting classes but that she has not completed the objectives related to housing, maintaining employment, and parenting practices. McKay opined that even though appellant provided a certificate evidencing completion of the parenting class, her observation of appellant's parenting skills during visitation left her with the impression

that appellant had not benefited from the class. McKay did not believe appellant's parenting was appropriate.

{¶ 19} McKay testified that she provided appellant with referrals necessary for her to complete other portions of the case plan but that appellant has not followed through. Appellant was evicted from housing McKay had obtained for her after five months due to non-payment of rent, but she did not inform McKay of this fact. Appellant has yet to obtain medical insurance for her youngest child, I.W., born March 29, 2019, even though McKay had made the required social services referrals. McKay testified that appellant has had a problem obtaining stable employment and that she has had four different jobs during the pendency of this case.

{¶ 20} McKay did not consider appellant's current housing appropriate for the children, as she has been living with her mother at a Motel 6 since January of 2020. With regard to the children's medical and counseling sessions, McKay maintained that she and/or foster parents have provided appellant with the relevant information, and McKay has offered appellant help with transportation when requested, but that appellant has not attended any of the children's in-person appointments. McKay testified that appellant has missed previously scheduled semi-annual review sessions.

{¶ 21} McKay stated that appellant has been relatively consistent with visitation but that she has missed a number of visits citing work and transportation issues. The children have also expressed a reluctance to participate in visitation or to engage with appellant. McKay testified that the children have been in foster care since August of 2018, when they were removed from appellant's custody. According to McKay, the children were initially placed in separate foster homes, but later placed in the same home. McKay informed the juvenile court that the children's current foster parents are potential adoptive parents.

{¶ 22} McKay told the juvenile court that each of the children is afflicted with a serious physical illness or genetic disorder, ongoing psychological conditions, cognitive deficits, and developmental delays. For example, both I.J.H. and I.A.H-W. are afflicted with digestive disorders that prevent them from metabolizing certain foods, and all three children suffer from anxiety arising from childhood trauma. All three children are small for their age and otherwise developmentally delayed. According to McKay, appellant does not have a meaningful understanding or appreciation of the nature and extent of the children's medical

and psychological conditions and needs. For example, McKay observed that appellant continued to bring inappropriate snack foods to visitations, even after being informed of their dietary restrictions.

{¶ 23} McKay stated that, based on her observation of the children's interactions with appellant and the foster parents, the children are bonded with the foster parents and one another, but not with appellant. McKay expressed her concern that the specialized needs of these children would not be met if custody was restored to appellant. She opined that PCC was in the best interest of all three children.

{¶ 24} Lay GAL Jacobson testified that she has been working on this case since March of 2020, and she has met weekly with the children and the children's caseworker for the past 12 to 18 months.[1] During that time, Jacobson has spoken with the children's teachers and she has observed the children in their interaction with appellant and with the foster parents. Jacobson reached out to the children's father but received no response.

{¶ 25} She described the children's interactions with their foster parents as "very open[,] * * * very communicative," "[t]hey do things together as a family," and foster mother "is very involved in the kids artistic stuff * * * [and] she does a lot of projects with them." (Apr. 12, 2022 Tr. at 169.) By contrast, Jacobson testified that the children get "very anxious" prior to visits with their mother. (Tr. at 171.) According to Jacobson, I.M.H. has pulled her hair out prior to scheduled visits and I.J.H. has periodically refused to attend. Jacobson opined that the children were bonded with their foster parents, the foster parents' daughters, and with one another, but not with appellant.

{¶ 26} Jacobson testified extensively about the children's medical condition, emotional difficulties, and developmental delays. With regard to I.A.H-W., Jacobson told the juvenile court about his physical limitations and the improvement she has observed in the recent past:

> [I.A.H-W.] has the congenital sucrase-isomaltase deficiency,
> which is the inability of the body to absorb sugars within the
> food. With that the - - when he has food that he is not allowed
> to have his stomach pumps up - - pulls - - builds up explosive
> and excessive diarrhea, which is why he's still in - - was in

---

[1] On March 31, 2022, the GAL, Suzanne Barker, submitted her report to the juvenile court. She recommended PCC for all three children.

diapers and is - - is still in pull-ups. And for that he is on medication. He takes eight pills. Every time he eats something he has to take these pills. It appears to be working when we saw him on Thursday. He was much more energetic, much more attentive. He looks healthier. He's gained a little bit of weight. He just appears more healthy than he was before having had the treatment that he has. He also has issues with his legs. He cannot run, he cannot skip. He has a lot of muscle weakness in his legs. They're working with him on that. The foster parents work with them - - with him on that, doing exercises, building up his - - his muscle capacity. He also cannot urinate standing up. He has to sit down to urinate. He is under the care of a urologist to determine why that is occurring. Whether it's scar[r]ing from the burns or is some other type of issue. * * * He does have PTSD - - has been diagnosed with PTSD.

(Tr. at 173-74.)

{¶ 27} Jacobson testified the medical and psychological issues facing I.M.H. are as follows:

For [I.M.H.], she also has the a - - the congenital deficiency with the sugar. She is very anxious. She is on medication for her anxiety. She tends to not be as expressive as the other children. They are - - she - - the pills that - - and the medications that they are taking for the deficiency is not - - does not appear to be working for [I.M.H.]. So, she is having to go back and be rescoped and they're going to do some biopsies to try to determine what exactly is going on with that. As reported before, she's very small stature. She's - - in some of the reports, it talks about she is the - - the height of a two-year-old and the weight of a two-year-old. She is failure to thrive as is [I.A.H-W.], due to their - - that deficiency. She also has been through - - the counseling has been counsel for her anxiety and how to - - her cognitive issues and how to express feelings.

(Tr. at 174-75.)

{¶ 28} Jacobson summarized the emotional and educational issues facing I.J.H. as follows:

[I.J.H.] has anxiety issues, extreme anxiety issues. She gets very nervous. When she gets nervous or excited, she will do some self-harm to herself and they're working on that. She'll bite her lip, the inner lip so hard that it bleeds. So, they - - in the counseling they are addressing that with her. She is on medication. Like I say, she sleepwalks a lot. She wakes up at

four or five o'clock in the morning, does not go back to sleep. She had some issues in school when they were doing it virtually. They did not do an I.E.P. on her. The school did not feel that they needed to do one. So, one was not completed. She has repeated kindergarten, so now she's in first grade. Doing much better but had a rough time last year keeping up with things virtually on the computer. So, her attention span is very short.

(Tr. at 172-73.)

{¶ 29} Jacobson testified that in her conversations with appellant, appellant did not inquire about the children's special needs. Jacobson also told the juvenile court that she believed each of the children was capable of expressing their wishes for the future and that all three children told her they wished to remain with their current foster parents. In Jacobson's opinion, the children had not been coached in this regard. Jacobson provided the juvenile court with her opinion as to the children's best interest:

Q. So, it's your testimony that the children, un-persuaded, have stated that they wish to live with their foster parents?

A. Yes.

Q. Do you believe that's in the children's best interest?

A. Yes.

Q. And why do you believe that's in the children's best interest?

A. Again, the - - the determination of the foster parents to make sure that their medical and health care needs are taken care of, that their mental health needs are taken care of. Just the bond that I've seen grow between them. The - - the - - the family atmosphere that is in the home that the children have just thrived on. They consider themself family. They talk about aunt, who is the - - the foster mother's sister. They call her aunt. It's become a family unit.

(Tr. at 183-84.)

{¶ 30} One of the children's foster parents, C.D., testified at the permanent custody hearing. According to C.D., he and his wife have had custody of all three children for the past three years. C.D. and his wife have four older daughters, but only two of them are still at home. He testified that the special needs of the children include a digestive disorder known as Congenital Sucrase-Isomaltase Deficiency, Post Traumatic Stress Disorder, and anxiety disorder. As a result of their psychological conditions, all three children attend

weekly counseling sessions at Buckeye Ranch. According to C.D., appellant has been offered the opportunity to attend in-person counseling sessions but she has not done so. C.D. testified that the two younger children essentially need constant attention and supervision in order to remain safe, healthy, well-nourished, and to progress in their schoolwork. C.D. told the juvenile court that all three children see medical doctors on a regular basis for the diagnosis and treatment of their respective genetic disorders. Both I.J.H. and I.A.H-W. take prescribed medication as treatment for a digestive disorder. Though C.D. stated that he and his wife initially communicated with appellant regarding scheduled appointments and that appellant had the opportunity to attend in-person medical appointments, she has never done so.

{¶ 31} Appellant testified that she is currently living at a Motel 6 with her mother who works in housekeeping at a hotel. The testimony shows that appellant obtained two hotplates for cooking and a refrigerator where she supposes that the children's medications could be stored. Appellant has acknowledged that the hotel room does not qualify as adequate housing for herself, her mother, and her four children. Appellant testified that she has been looking for a two bedroom apartment in the Mt. Vernon, Ohio area, but she has not yet found anything suitable and affordable. She believes a two bedroom apartment would be sufficient for herself, her mother, and her four children.

{¶ 32} Appellant testified that she currently makes $15 per hour as a housekeeper at Nationwide Hotel, earning $2,000 per month. Appellant pays $1,200 per month for the hotel room she occupies with her mother at the Motel 6. Appellant testified that her recent employment history included working a seasonal position with Abercrombie Fitch and a previous position with DoubleTree Hotel. Appellant maintains that she owns a vehicle and has auto insurance. She acknowledges that the children have suffered psychological trauma and she is aware they are all in counseling for depression and anxiety, but she claims not to know why the children are seeing medical professionals. She did acknowledge that she was told to stop bringing certain snack foods to the weekly visitation.

{¶ 33} Following the custody hearing, the trial court found by clear and convincing evidence that PCC was in the best interest of I.J.H., I.M.H., and I.A.H-W. In our view, the testimony of FCCS' witnesses provides clear and convincing evidentiary support for the trial court's finding that PCC is in the best interest of all three children.

{¶ 34}   Both caseworker McKay and GAL Jacobson, testified that the children's interaction and interrelationship with their foster parents was open and nurturing, and that the children were bonded with their foster parents and one another.  Neither McKay nor Jacobson believed the children were bonded with appellant.  C.D. testified that two of his daughters also live in the home and that they have embraced their role as older sisters to the three children.  The testimony also shows that foster parents are working closely with the children's medical and psychological professionals and, as a result, the children's medical and psychological condition has improved in foster care.

{¶ 35}   As previously noted, all three children have been in the temporary custody of FCCS since they were removed from appellant's home in August of 2018, and they have been living with their current foster family for more than three years.  With regard to the wishes of the children, Jacobson testified that each of the children has expressed directly to her that they wish to remain with their foster parents.  Jacobson believed all three children were mature enough to express their wishes to her and that their responses were not rehearsed.

{¶ 36}   With regard to the children's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency, the testimony of all three of FCCS' witnesses established that these children desperately need a legally secure permanent placement given their special needs and their attachment to one another.  The children have resided together in the home of their foster parents for the last three years and the evidence shows that the foster parents are willing and able to care for the children, and have expressed a desire to explore adoption.  Given the specialized medical, psychological, developmental and educational needs of these three children, as demonstrated in the record, legally secure permanent placement cannot be achieved without a grant of permanent custody to FCCS.

{¶ 37}   The juvenile court found that none of the factors listed R.C. 2151.414(E)(7) through (11) applied in relation to appellant and the children.

{¶ 38}   Appellant argues that PCC is not warranted in this case because C.H. no longer has access to her children and, as a result, she has remedied the conditions that lead to their removal.  Appellant, however, was convicted of endangering a child based on her failure to intervene for the benefit of I.A.H-W. and subsequent failure to seek medical attention for his very serious injuries.  Furthermore, her argument totally overlooks the

appalling physical condition of I.J.H. and I.M.H. that resulted in their removal from her custody. The juvenile court determined that both I.J.H. and I.M.H. were neglected children; a finding appellant did not contest. Removing C.H. from the children's lives was but a first step in regaining custody.

{¶ 39} Appellant also maintains that PCC is not warranted at this time because she has substantially complied with the case plan objectives in that she has completed a domestic violence assessment and parenting classes, and she has been consistent with her visitation. However, the testimony of FCCS' witnesses reveals that appellant has fallen short of significant objectives in the case plan including maintaining stable employment and obtaining suitable housing. The evidence also shows that appellant has demonstrated a lack of involvement in the children's medical appointments and counseling sessions, which has manifested in a lack of understanding of the nature and extent of the children's serious medical and psychological conditions, and a lack of awareness of their developmental delays. Though appellant claims that her caseworker and the foster parents have kept her in the dark about these issues, the evidence in the record belies her claim.

{¶ 40} Moreover, the statutory standard the juvenile court is required to apply in ruling on the motion for PCC mandates consideration of the statutory factors set out in R.C. 2151.414(D)(1)(a) through (e). In other words, though appellant removed an obvious impediment to reunification by disassociating herself with C.H. and she has satisfied certain objectives of the case plan, the evidence shows that appellant failed to address serious concerns for the health and safety of the children. Those concerns manifested upon removal of the children and later became the focus of the case plan adopted by the juvenile court.

{¶ 41} Here, the trial court reviewed the evidence presented at the custody hearing in light of the "best interest" analysis required by R.C. 2151.414(D)(1). Based on the juvenile court's review of the evidence relevant to the R.C. 2151.414(D)(1) factors, the juvenile court made a finding, by clear and convincing evidence, that permanent custody is in the best interest of I.J.H., I.M.H., and I.A.H-W. Based on our review of the evidence in the record, we find that the juvenile court judgments are supported by sufficient evidence and not against the manifest weight of the evidence.

{¶ 42} Appellant nevertheless contends that the trial court erred when it concluded that R.C. 2151.414(B)(2) and 2151.414(B)(1)(a) applied to the children in this case because

FCCS did not move for PCC pursuant to division (D)(2) of R.C. 2151.413, and because all three children have unquestionably been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period. Though we agree that R.C. 2151.414(B)(1)(d) is the relevant provision in this case, not R.C. 2151.414(B)(2) nor 2151.414(B)(1)(a), any error on the part of the juvenile court with regard to the R.C. 2151.414(B)(2) and 2151.414(B)(1)(a) analysis is harmless error given our conclusion that the weight of the evidence supports error the juvenile court's best interest determination. *See In re A.E.*, 10th Dist. No. 19AP-782, 2021-Ohio-488, ¶ 29, fn. 1; *T.L.* at ¶ 15, fn. 1.

{¶ **43**}   For the foregoing reasons, we hold that the judgments awarding permanent custody of I.J.H., I.M.H., and I.A.H-W. to FCCS is supported by competent, credible evidence, and is not against the manifest weight of the evidence. Accordingly, we overrule appellant's sole assignment of error.

## V. Conclusion

{¶ **44**}   Having overruled appellant's sole assignment of error, we affirm the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgments affirmed.*

BOGGS and LELAND, JJ., concur.

———————————