[Cite as *In re K.M.*, 2024-Ohio-2137.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| K.M., | : | No. 23AP-168 |
| | | (C.P.C. No. 18JU-10094) |
| (K.E., Mother, | : | |
| | | (REGULAR CALENDAR) |
| Appellant). | : | |
| In the Matter of: | : | |
| T.M., aka K.M., | : | No. 23AP-169 |
| | | (C.P.C. No. 19JU-10948) |
| (K.E., Mother, | : | |
| | | (REGULAR CALENDAR) |
| Appellant). | : | |

D E C I S I O N

Rendered on  June 4, 2024

**On brief:** *Yeura R. Venters*, Public Defender, and *Robert D. Essex*, for appellant.

**On brief:** *Sharon K. Carney* for Franklin County Children Services.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

EDELSTEIN, J.

{¶ 1}  Appellant, K.E., mother of K.M. and T.M.,[1] appeals from the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating her parental rights and placing K.M. and T.M. in the permanent custody of

---

[1] The court filings also refer to the younger child as K.M. but for sake of clarity, the decision will refer to him as T.M.

appellee, Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} These cases involve separate, consolidated appeals from two juvenile court judgments granting FCCS permanent court commitment ("PCC") of appellant's two minor children, K.M., born in December 2015, and T.M., born in September 2019. The father of K.M., who is also the alleged father of T.M., has not filed appeals and, therefore, the following facts are generally limited to those relevant to appellant.

{¶ 3} FCCS became concerned with K.M.'s wellbeing in June 2018, and initially filed a complaint alleging substance abuse and domestic violence under a prior case number.[2] K.M. was placed in the custody of FCCS on August 22, 2018. With the prior case set to expire by operation of law, FCCS filed a new complaint on August 28, 2018 alleging K.M. was a dependent child pursuant to R.C. 2151.04(C). The complaint cited concerns with domestic violence, appellant's potential substance abuse and lack of consistent drug screenings, appellant's untreated mental health issues, appellant's lack of employment, unstable housing, and K.M.'s unaddressed developmental delays. The trial court granted FCCS a temporary order of custody under the new case number and the parents were ordered to participate in random drug screens and a domestic violence assessment, including following any recommendations.

{¶ 4} At trial on October 22, 2018, appellant did not contest the dependency count, and the court found K.M. to be a dependent child pursuant to R.C. 2151.04(C). The court granted a temporary court commitment to FCCS and ordered the parents to comply with the case plan. FCCS initially filed a motion for permanent custody of K.M. on June 27, 2019, which alleged the parents had not remedied the conditions that caused K.M. to be removed and they had failed to complete their case plans.

{¶ 5} FCCS then became involved with K.M.'s sibling, T.M., immediately upon T.M.'s birth in September 2019. FCCS filed a complaint on September 19, 2019, amended a day later, alleging T.M. was an abused child pursuant to R.C. 2151.031(C) and (D), a neglected child pursuant to R.C. 2151.03(A)(2), and a dependent child pursuant to R.C.

---

[2] *See* 18JU-6840.

2151.04(C) and (D). Among other matters, the complaint alleged T.M. was born with drugs in his system, suffered withdrawal, and required hospitalization in the NICU, the parents had not addressed their serious chemical dependency and mental health issues or secured stable housing, and appellant was not employed. After a hearing, FCCS was granted a temporary order of custody and the matter came for trial on December 3, 2019. The parties did not contest the two counts alleging abuse, and the state requested the court dismiss the other three counts. The court found T.M. to be an abused child pursuant to R.C. 2151.031(C) and (D) and set the matter for a dispositional hearing.

{¶ 6} FCCS filed two additional PCC motions seeking permanent custody of K.M., dated December 6, 2019 and March 16, 2022. The latter motion was based on R.C. 2151.414(B)(1)(a) and (B)(1)(d) and the parents' failure to comply with their case plans. As to T.M., FCCS filed two PCC motions, dated August 14, 2020 and March 21, 2022, with the most recent motion also premised on R.C. 2151.414(B)(1)(a) and (B)(1)(d) and the parents' failure to comply with their case plans.

{¶ 7} Following multiple continuances, the matter came before the trial court in a consolidated trial on December 5, 2022. Although the parents were notified about the hearing, neither parent appeared. Appellant's counsel communicated with appellant by text message, and appellant said she had a doctor's appointment. Appellant did not utilize a taxi ordered by the trial court to assist her in getting to the hearing. With counsel for both parents present, the trial court commenced the trial. Four witnesses testified: Rachelle Gallagher, a caseworker supervisor for FCCS; T.L., the foster mother for K.M.; L.G., the foster mother for T.M; and Michael J. Lerner, the guardian ad litem ("GAL").

{¶ 8} Ms. Gallagher testified that FCCS became involved with appellant and K.M. due to a domestic incident. FCCS also became concerned with how appellant was caring for K.M., noting K.M. was behind developmentally and appellant did not take him to routine doctor's appointments. K.M. was removed from appellant's care in August 2018 and placed with a relative for a short time before receiving a foster placement with T.L. and her family, with whom K.M. still resides.

{¶ 9} As to T.M., Ms. Gallagher testified that FCCS became involved with him almost immediately after his birth in 2019. FCCS received concerns of physical abuse after he tested positive for marijuana, suboxone, nicotine, lidocaine, and gabapentin at birth.

T.M. experienced withdrawal from those substances, including tremors, high respiration rate, wheezing, an inability to self-sooth, and excessive sucking. T.M. was removed from appellant's care shortly after he was born and placed in foster care. T.M. has had the same foster care placement with L.G. and her family since his removal as an infant.

{¶ 10} Ms. Gallagher testified that FCCS established a case plan for appellant with the following objectives: complete a domestic violence assessment; complete a drug and alcohol assessment; complete a mental health assessment; complete random drug screens; complete parenting classes; have a legal source of income; and maintain safe and stable housing. She added that an additional part of the case plan required appellant to attend the children's medical appointments so she would know how to properly care for the special needs of the children if they were returned to her home.

{¶ 11} According to Ms. Gallagher, appellant completed a domestic violence assessment in early 2019, which resulted in a recommendation to undergo mental health counseling services. At the time of trial, appellant was receiving services through an approved agency, including weekly counseling sessions. Although appellant signed a release of information with the agency, FCCS had received only a letter from the agency saying appellant was compliant with services but did not receive the requested assessment and records.

{¶ 12} Ms. Gallagher testified that appellant also received drug and alcohol services and drug screens through the same approved agency. FCCS again received a letter from the agency saying appellant was compliant with services but did not receive the requested assessments or drug screens. FCCS asked appellant to obtain her records regarding the mental health counseling and drug and alcohol services, but appellant did not do so. Ms. Gallagher noted the drug screens appellant had completed through another agency returned positive for suboxone and marijuana. Appellant told FCCS that she had a valid prescription for suboxone through her provider, but she never provided proof of the prescription. Appellant additionally told FCCS she was "working on" getting a medical marijuana card but never produced a card. (Dec. 5, 2022 Tr. at 45.) Appellant's last drug test occurred over a year prior to trial—September 21, 2021.

{¶ 13} Ms. Gallagher further testified that appellant completed parenting classes in April of 2022. FCCS independently linked appellant with a parent mentor to assist her with

handling her children's special needs, but the mentor was not able to meet with appellant due to appellant's inconsistent visits with her children.

{¶ 14} As to visitations, Ms. Gallagher testified that, from June of 2021 to the trial date, appellant had the opportunity to visit with the children 73 times. Ms. Gallagher testified that appellant definitely attended 33 visits and may have attended 13 more for a maximum total of 46 visits. Appellant had visited with the children two times since the Labor Day prior to the December trial. Ms. Gallagher testified that reports from those visits indicate K.M. felt comfortable with appellant and would do activities such as coloring with her, but K.M. recognized his foster family as his parents and looked to them for comfort. Younger sibling T.M. was reportedly also comfortable with appellant but lacked a bond with her and also looked to his foster family for comfort. Both foster families are possible adoptive homes, and the families regularly meet up for playdates to ensure the siblings build a relationship with each other.

{¶ 15} According to Ms. Gallagher, both T.M. and K.M. have special needs that affect their care. T.M. has been diagnosed with autism, is non-verbal, and receives physical therapy, occupational therapy, and speech therapy. K.M. had been engaged in speech, occupational, and physical therapy, as well as ongoing counseling to address emotional regulation. Ms. Gallagher testified appellant did not meet the part of the case plan that required her to attend the children's doctor's appointments to learn how to properly care for their special needs despite FCCS providing appellant with the information to do so. According to Ms. Gallagher, FCCS spoke to appellant about how she would care for the special needs of the children and appellant responded, "I'll deal with it when that time comes." (Tr. at 80.) In contrast, the foster families did address the special needs of the children.

{¶ 16} Regarding employment and housing, Ms. Gallagher testified that appellant reported she was employed at Hollywood Casino but did not provide paystubs as proof of employment as requested by the agency. As recently as five months prior to trial, appellant did not have stable housing and was staying with friends. In July 2022, appellant secured an apartment that would be suitable for children. However, according to Ms. Gallagher, an eviction notice was filed in November 2022, shortly before trial, and those proceedings were pending in the Franklin County Municipal Court.

{¶ 17} To aid appellant in achieving her case plan objectives, Ms. Gallagher testified that FCCS provided appellant with referrals for drug and alcohol services, counseling services, and parenting classes, and provided gas cards and monthly bus passes. FCCS attempted to meet with the parents monthly to follow up on their progress, but the parents did not show up to appointments and did not answer their door. Appellant has also not consistently attended the FCCS semi-annual reviews. Overall, Ms. Gallagher recommended the court grant permanent custody to FCCS due to the parents' failure to attend doctor's appointments and not regularly visiting and bonding with the children.

{¶ 18} FCCS then called K.M.'s foster mother, T.L., to testify. According to T.L., K.M. was placed with her in August 2018 when he was two and one-half years old. Due to certain behaviors and limited speech, she was concerned he had autism. He also had trouble sleeping, snored, and had sleep apnea. T.L. sought help from physicians and testified that her pediatrician was alarmed to the point he quickly connected them with a Nationwide Children's Hospital ear, nose, and throat specialist, who in turn immediately scheduled him for surgery to remove his tonsils and adenoids, and to place tubes in his ears. T.L. additionally took K.M. to have an autism assessment, where he was diagnosed with developmental delay and global development delay, which included severe delays in fine motor skills, speech, and sensory adaptive skills, and moderate delay in gross motor skills. Due to the delays, K.M. was referred to mental and behavioral health services. To assist his development and education, T.L. enrolled K.M. in an intervention pre-school in her community school district. At the recommendation of the intervention pre-school, T.L. postponed kindergarten a year to address K.M.'s developmental delays. T.L. also arranged private speech therapy for K.M. T.L. testified she always kept the FCCS case manager and the foster agency informed about K.M.'s appointments but, over four years, appellant only attended once, when K.M. had tonsil surgery in 2018.

{¶ 19} T.L. testified that K.M. showed "phenomenal" improvement after these interventions. (Tr. at 141.) K.M. is now expressive, active, and no longer needs speech, occupational, or physical therapy. However, according to T.L., due to the trauma he experienced, K.M. will always need mental health counseling and continues to attend weekly counseling sessions. K.M. regresses occasionally, which T.L. testified last occurred about five weeks prior to trial when K.M.'s birth parents failed to attend a scheduled

visitation.  In T.L.'s words, the parents' failure to attend the visitation was "devastating" to K.M.  She explained that he cried and was "lashing around" and had problems in school the following week.  (Tr. at 148.)  According to T.L., the parents would cancel visitations often, and at one point in 2018, they went four months—from August to December—without any visits.  They would also arrive late to visitations.  T.L. testified that K.M. looked forward to the visits with the parents, appeared playful when he saw them, and was comfortable approaching them.

{¶ 20} T.L. testified she and her husband are very bonded with K.M., who refers to them as "mom" and "dad."  (Tr. at 159.)  T.L. voluntarily completed a parenting training course geared toward raising a child with special needs, and she is now able to sooth K.M. using the techniques she learned from that program.  K.M. and their biological eight-year-old son play together and behave as though they are brothers.  T.L. said she and her husband have a friendly relationship with T.M.'s foster parents and they ensure K.M. sees T.M. at least once a month.  She testified she plans on continuing to build that relationship.  T.L. testified that she and her husband would "[m]ost adamantly, a hundred percent" want to be considered as an adoptive placement for K.M.  (Tr. at 162.)

{¶ 21} One of T.M.'s foster parents, L.G., testified next.  According to L.G., T.M. was placed with her when he was five days old upon his release from the hospital intensive care unit.  L.G. testified T.M. was born addicted to drugs, initially had severe tremors and stiffness on the left side of his body, and has been very developmentally delayed his whole life.  L.G. sought resources to help T.M., including a "tremendous amount of physical therapy," speech therapy, occupational therapy, and "adaptive gym" through an intervention facility in their school district.  (Tr. at 178-79.)  He additionally sees a speech therapist at Nationwide Children's Hospital once a week and is waiting to be scheduled for an autism assessment and occupational therapy through the hospital.  L.G. testified T.M. can walk but requires ankle braces to counter weakness.  T.M. continues to have severely delayed language skills—at the time of trial he was working on two-word phrases as a three-year-old—but L.G. believed his language was improving.

{¶ 22} According to L.G., T.M. has about one and a half doctor's appointments per week, which she informs the FCCS case manager about well in advance of each appointment.  She has never seen the biological parents attend any appointments.  L.G.'s

wife quit her full-time job to provide T.M. the care he needs, which includes getting him to and from various appointments and pre-school.

{¶ 23} L.G. described T.M.'s scheduled visitations with his biological parents as "hit and miss." (Tr. at 177.) They had two visitations in the five months prior to the trial. They declined an opportunity to visit T.M. when K.M. was sick. According to L.G., T.M. "melts down" at the door when the parents arrive for their visits and won't move until the supervisor or K.M., who is also present at the visitations, convinces him to come inside. (Tr. at 192.) L.G. testified that appellant "will have nothing to do with [T.M.]" when he is upset and laying on the floor. (Tr. at 192.) During these visits, T.M. goes to his sibling K.M. and eventually "warms up" to the parents. (Tr. at 192.) After each visit, T.M. runs into L.G.'s arms.

{¶ 24} L.G. described her relationship with K.M.'s foster parents in familial terms: they are all "related by circumstances because we know that for the rest of our lives we're gonna be spending time together assuming that we get the chance to adopt them." (Tr. at 177.) The two families "get along * * * very well," and L.G. makes sure T.M. spends time with K.M. and his foster family, including birthdays and holidays. (Tr. at 177.) According to L.G., T.M. is affectionate with both her and her wife, seeks them out for comfort, and is bonded to both of them and to L.G.'s parents. T.M. is familiar and friendly with L.G.'s 18-year-old former foster daughter, who visits them. L.G. testified that if T.M. becomes available for adoptive placement, she would like to adopt him "[a] hundred percent." (Tr. at 189.)

{¶ 25} Finally, the GAL for both K.M. and T.M., Michael J. Lerner, testified. According to the GAL, he interviewed appellant but had not conducted an investigation of her residence. After several attempts, and due to the limited amount of visitations that occurred, he did not get a chance to see K.M. interact with appellant. He visited K.M. at his foster placement, which he described as "remarkable"—"it is [a] family." (Tr. at 206.) The GAL testified that K.M. considers his foster parents "mom and dad" and "loves his family very much." (Tr. at 206.) K.M. was able to communicate his wishes to the GAL and expressed his desire to continue living with his foster family.

{¶ 26} The GAL described T.M., who was about three at the time, as delayed and essentially non-verbal, but able to understand his surroundings, and interact appropriately,

engage, and play with his foster family. According to the GAL, T.M. was not able to express his wishes on placement or custody.

{¶ 27} The GAL testified that although appellant had completed some aspects of her case plan, he nevertheless had "substantial concerns" regarding her ability to care for K.M. and T.M. (Tr. at 215.) Considering the special needs of the children, he concluded it is a "big deal" that appellant did not attend any medical appointments. (Tr. at 215.) He was also concerned that appellant missed visitations with the children, had been unable to maintain a residence, and was facing eviction at the time of trial. He recommended the court grant permanent custody of both K.M. and T.M. to FCCS.

{¶ 28} The trial court issued its decision and judgment on permanent custody on February 22, 2023. The trial court first determined that R.C. 2151.414(B)(1)(a) and (B)(1)(d) applied as K.M. and T.M. could not and should not be placed with either parent within a reasonable time and because both children had been in the continuous custody of FCCS for periods in excess of 12 months. The trial court then concluded, after considering the applicable factors, that termination of parental rights is in the best interest of the children under both R.C. 2151.414(D)(1) and 2151.414(D)(2). Having concluded the two-part test for PCC was met, the trial court granted FCCS's March 16, 2022 motion for permanent custody of K.M., and March 21, 2022 motion for permanent custody of T.M.

## II. Assignments of Error

{¶ 29} Appellant appeals and raises the following assignment of error for our review:

> The trial court committed reversible error by terminating the appellant-mother's parental rights when the decision was against the manifest weight of the evidence.

## III. Analysis

{¶ 30} "[P]arents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests' " recognized in American law. *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000). *Accord In re Murray*, 52 Ohio St.3d 155, 157 (1990). *See also Stanley v. Illinois*, 405 U.S. 645, 651 (1972).

{¶ 31} However, a parent's fundamental right to raise their child is " 'not absolute.' " *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58

(Fla.App.1974). A parent's natural rights are "always subject to the ultimate welfare of the child." *Id.* Thus, in certain circumstances, the state may terminate the parental rights of natural parents when it is in the best interest of the child. *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, ¶ 11. *B.C.* at ¶ 20 ("Ultimately, parental interests are subordinate to the child's interest when determining the appropriate resolution of a petition to terminate parental rights."). "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991). "Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' " *Id.* at 48, quoting *Smith* at 16.

{¶ 32} In Ohio, the termination of parental rights is governed by R.C. 2151.414. Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to a children's services agency if the court determines by clear and convincing evidence that: (1) one of five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies; and (2) it is in the best interest of the child to do so. *In re Z.C.*, 173 Ohio St.3d 359, 2023-Ohio-4703, ¶ 7. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 33} "[T]he proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments that are presented by the parties." *Z.C.* at ¶ 18 (rejecting use of the abuse of discretion standard in reviewing permanent custody determinations under R.C. 2151.414 and clarifying that separate standards for sufficiency and manifest weight of the evidence apply instead). Furthermore, "although the phrase 'some competent, credible evidence' can be helpful in describing the reviewing court's deferential role in the manifest-weight analysis, it should not be used as a substitute for the separate sufficiency and manifest-weight analyses appropriate for permanent-custody determinations" as set forth in *State v. Thompkins*, 78

Ohio St.3d 380 (1997) and *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179. *Z.C.* at ¶ 15.

{¶ 34} The sufficiency of the evidence standard tests the adequacy of the evidence: a court of appeals should affirm a trial court when the evidence, if believed, is legally sufficient to support the verdict as a matter of law. *Z.C.* at ¶ 13; *Thompkins* at 386. The manifest weight of the evidence standard concerns the effect of the evidence in inducing belief. *Z.C.* at ¶ 13; *Thompkins* at 387. "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Z.C.* at ¶ 14, citing *Eastley* at ¶ 20. " 'In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact.' " *Z.C.* at ¶ 14, quoting *Eastley* at ¶ 21.

{¶ 35} In this case, appellant does not dispute that both K.M. and T.M. have been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period or that either R.C. 2151.414(B)(1)(a) or 2151.414(B)(1)(d) is satisfied. As a result, the first requirement for PCC—satisfying one of five factors enumerated in R.C. 2151.414(B)(1)(a) through (e)—is met, so the dispositive issue becomes whether the decision to grant permanent custody to FCCS is in the best interest of the children under R.C. 2151.414(D).

{¶ 36} The trial court determined granting permanent custody to FCCS is in the best interest of the children under both R.C. 2151.414(D)(2), which conclusively establishes permanent custody is in the best interest of the child if four factors are met and requires a court to commit the child to the permanent custody of the agency, and R.C. 2151.414(D)(1), which permits a court to commit the child to the permanent custody of the agency after the court considers relevant factors.

{¶ 37} Appellant contends the trial court's analysis of these best interest factors resulted in a PCC ruling that is against the manifest weight of the evidence. However, as explained below, while we acknowledge appellant complied with parts of her case plan, the trial court's assessment that FCCS should be granted permanent custody of the children pursuant to R.C. 2151.414 is nevertheless supported by the manifest weight of the evidence in this case.

### A. *Best interest of the child determination under R.C. 2151.414(D)(2)*

{¶ 38} Pursuant to R.C. 2151.414(D)(2), if all four listed factors apply, permanent custody is conclusively established to be in the best interest of the child, and "the court shall commit the child to the permanent custody" of the agency. Appellant does not contest the trial court's determination that R.C. 2151.414(D)(2)(b) through (d) are met. Instead, appellant appears to challenge the trial court's finding as to R.C. 2151.414(D)(2)(a). That subsection requires the trial court to determine "by clear and convincing evidence that one or more of the factors in [R.C. 2151.414(E)] exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent." R.C. 2151.414(D)(2)(a). At various points in its decision, the trial court found R.C. 2151.414(E)(1), (4), and (10) were met. (Feb. 22, 2023 Jgmt. Entry at 9, 11.)

{¶ 39} Initially, we note the trial court's analysis of whether appellant abandoned the children under R.C. 2151.414(E)(10) did not consider the definition of an abandoned child under R.C. 2151.011(C), which states: "For the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." *See In re A.P.*, 10th Dist. No. 23AP-253, 2024-Ohio-741, ¶ 51-54 (noting R.C. 2151.011(C) does not contain a requirement of any particular intent to abandon the child on behalf of the parent). Here, while K.M.'s foster mother testified appellant did not visit K.M. from August to December 2018, there is no testimony to demonstrate appellant failed to maintain contact of any sort with K.M. Furthermore, no testimony expressly states appellant also failed to visit T.M. during this period or that appellant failed to maintain contact with T.M. As a result, we disagree with the trial court that R.C. 2151.414(E)(10) is met as to either child.

{¶ 40} Regardless, clear and convincing evidence supports the trial court's findings as to R.C. 2151.414(E)(1) and (4). First, R.C. 2151.414(E)(1) states:

> [f]ollowing the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the

parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

The conditions that led to K.M.'s removal from appellant's home included concerns that K.M. was exposed to domestic violence, appellant's potential substance abuse and lack of consistent drug screenings, appellant's untreated mental health issues, appellant's lack of employment, her unstable housing, and the parents' failure to address K.M.'s developmental delays. The conditions that led to T.M.'s removal from appellant's custody included T.M.'s health issues having been born with drugs in his system, the parents' unaddressed and serious chemical dependency and mental health issues, and the parents' lack of stable housing and employment.

{¶ 41} The testimony provided by the FCCS caseworker shows that, after K.M. and T.M. were placed in the agency's temporary custody, FCCS engaged in reasonable case planning in an effort to reunite appellant with the children and made efforts to assist her in accomplishing this goal, such as providing appellant with referrals for drug and alcohol services, counseling services, and parenting classes, providing gas cards and monthly bus passes, and holding regular progress meetings. Furthermore, while the record shows appellant completed parts of the case plan, testimony provided by the FCCS caseworker, the GAL, and the foster parents demonstrate that appellant had not completed drug screenings in more than a year prior to trial, appellant did not provide proof of employment, appellant's apartment, although suitable for the children, was subject to eviction proceedings at the time of trial, and appellant had not attended the children's medical appointments or otherwise made an effort to learn how to care for her children with special needs. We find R.C. 2151.414(E)(1) is met.

{¶ 42} The trial court's finding as to R.C. 2151.414(E)(4) is likewise supported by clear and convincing evidence. R.C. 2151.414(E)(4) states, "The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child." Through testimony provided by the FCCS

caseworker, the GAL, and the foster parents, FCCS established that appellant's visitations with the children were inconsistent and appellant showed an unwillingness to provide an adequate permanent home for the children by failing to remedy her unstable housing situation, not attending the children's medical appointments, and not providing proof of her progress with drug dependency by completing drug screens or proof of employment when requested.

{¶ 43} Therefore, because all four factors listed in R.C. 2151.414(D)(2) apply for both K.M. and T.M., permanent custody is in the best interest of the children, requiring permanent custody to be granted to FCCS.

## B. *Best interest of the child determination under R.C. 2151.414(D)(1)*

{¶ 44} While the best interest of the child finding under R.C. 2151.414(D)(2) is sufficient to support granting the PCC motion alone, we also find the trial court's best interest determination under R.C. 2151.414(D)(1) is supported by clear and convincing evidence as to both children. R.C. 2151.414(D)(1) provides that in determining the best interest of a child, the court shall consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

In this case, the trial court made findings under each R.C. 2151.414(D)(1) factor, as follows.

{¶ 45} Under R.C. 2151.414(D)(1)(a), the trial court determined that although both children seemed comfortable with appellant, she failed to achieve a bond with either child or demonstrate a commitment to achieving reunification by her failure to consistently visit the children, failure to attend their medical appointments, and failure to attend trial. Conversely, the trial court found the children are very bonded to their foster parents, who the children both look to for comfort. The court noted that K.M. additionally has a bond with the foster parents' eight-year-old son and parents, while T.M. has a good relationship with the foster parents' older daughter who no longer lives in the home. The trial court additionally found the two foster families have an excellent relationship with each other and meet regularly to socialize the siblings, and both foster parents testified they will adopt K.M. and T.M if they are given the chance to do so.

{¶ 46} Under R.C. 2151.414(D)(1)(b), the trial court determined K.M. wished to live with his foster family rather than his parents, although K.M. was not asked whether he would regret never seeing appellant again. The trial court determined T.M. was unable to express his wishes as to who he wanted to live with.

{¶ 47} Under R.C. 2151.414(D)(1)(c), the trial court found that upon K.M.'s removal on August 22, 2018, he had been placed with his paternal grandparents for a short period of time, and then, from February 8, 2019 until the date of the trial, had lived with his current foster parents. The trial court determined T.M. had lived with his current foster parents ever since he was discharged from the hospital as an infant (September 2019).

{¶ 48} Under R.C. 2151.414(D)(1)(d), the trial court discussed the special health and educational needs of each child, which amplified the children's need for a legally secure permanent placement, and appellant's failure to attend their medical appointments despite notice of them. The trial court found the foster parents proved to be prepared to meet the

significant special needs of the children, while appellant was not prepared to meet those special needs.

{¶ 49} Under R.C. 2151.414(D)(1)(e), the trial court determined appellant abandoned both children under R.C. 2151.414(E)(10) by failing to visit the children, attend their medical and therapy appointments, and attend trial.

{¶ 50} As additional relevant factors, the trial court cited the recommendations of the GAL and the FCCS caseworker that the motions for permanent custody be granted as to both children and appellant's failure to complete some essential elements of the case plan.

{¶ 51} In challenging the trial court's analysis, appellant argues that granting PCC is the "last resort" and should not have occurred in this case because appellant "did complete several major components of her case plan." (Emphasis omitted.) (Appellant's Brief at 10, 19.) Appellant contends she completed the domestic violence assessments with no recommended follow up, the mental health assessment, parenting classes, signed releases of information, was gainfully employed, and had an apartment that FCCS deemed appropriate for the two children. Appellant believes her completion of these case plan requirements demonstrates her desire to reunite with her children and undercuts the trial court's finding that she abandoned her children and did not complete the essential elements of her case plan.

{¶ 52} Initially, as noted above, we agree with appellant as to the abandonment finding. We do not find clear and convincing evidence supported the trial court's abandonment finding under R.C. 2151.414(D)(1)(e) and 2151.414(E)(10) because the trial court's analysis did not consider the temporal requirement under R.C. 2151.011(C), which is not met on the record of this case.

{¶ 53} We additionally recognize appellant successfully completed several significant parts of her case plan. Appellant signed releases of information for FCCS to monitor her compliance with her case plans, completed parenting classes, completed the domestic violence assessment, and continues to participate in the recommended mental health counseling. Nevertheless, for the following reasons, appellant's accomplishments with her case plan do not outweigh the totality of the factors demonstrating FCCS should be granted permanent custody of the children in this case.

{¶ 54} Evidence of a parent's completion of case plan objectives is relevant, but not dispositive, to the best-interest determination under R.C. 2151.414(D). *In re M.W.*, 10th Dist. No. 19AP-769, 2020-Ohio-5199, ¶ 57. Thus, a parent's successful completion of a case plan does not preclude a trial court from determining permanent custody of a child with the agency is warranted, particularly where the parent has not remedied the conditions that caused the child to be removed from the home. *In re B.R.*, 10th Dist. No. 18AP-903, 2019-Ohio-2178, ¶ 47, quoting *In re E.B.*, 12th Dist. No. CA2009-10-139, 2010-Ohio-1122, ¶ 30. *See also M.W.* at ¶ 57 (determining the trial court's best interest analysis was not against the manifest weight of the evidence despite the mother's substantial completion of her case plan at the time of trial).

{¶ 55} A recent example from this court illustrates this point. In *In re I.J.H.*, 10th Dist. No. 22AP-332, 2023-Ohio-941, ¶ 39-40, the mother-appellant maintained that PCC was not warranted because she had substantially complied with the case plan objectives. She completed a domestic violence assessment and parenting classes and was consistent with visitations. This court determined that, despite her progress, the testimony presented revealed appellant had fallen short of significant objectives in the case plan, including maintaining stable employment and obtaining suitable housing. The testimony further showed the appellant had "demonstrated a lack of involvement in the children's medical appointments and counseling sessions, which has manifested in a lack of understanding of the nature and extent of the children's serious medical and psychological conditions, and a lack of awareness of their developmental delays." *Id.* at ¶ 39. We further emphasized that a parent's compliance with the case plan must be viewed within the broader context of the statutory factors set out in R.C. 2151.414(D)(1)(a) through (e). *Id.* at ¶ 40. Viewed in that context, we determined the appellant's completion of certain objectives of the case plan and removal of some impediments to reunification were not enough to demonstrate the PCC motion should have been denied since the evidence showed the appellant "failed to address serious concerns for the health and safety of the children." *Id.* at ¶ 40.

{¶ 56} The case at hand is analogous to *In re I.J.H.* Despite appellant's successful completion of some case plan objectives, testimony provided by the FCCS caseworker, the GAL, and the foster parents demonstrate that appellant failed to address serious concerns with the health and safety of the children. Appellant had not completed drug screenings

since over a year prior to trial, and appellant had not attended the children's medical appointments or otherwise made an effort to learn how to care for children with special needs. Appellant admits her visitations with the children were inconsistent. Furthermore, while appellant asserts she has a legal source of income and safe and stable housing, she did not provide proof of employment when requested to do so, appellant's apartment was subject to eviction proceedings at the time of trial, and the testimony showed she had a history of unstable housing. Moreover, evidence presented concerning the significant bond between the children and their foster families and lack of bond with appellant, their custodial histories, their heightened need for a legally secure placement due to their special needs that appellant failed to show she can manage, K.M.'s expressed desire to remain with his foster family, and the recommendation of the GAL all weigh in favor of the trial court's best interest determination under R.C. 2151.414(D)(1). *See* R.C. 2151.414(D)(1)(a) through (d). Considering all of the R.C. 2151.414(D)(1) factors, we agree with the trial court's determination that granting permanent custody of the children to FCCS is in K.M. and T.M.'s best interest and is not against the weight of the evidence.

{¶ 57} Having determined granting permanent custody of K.M. and T.M. is in the best interest of the children under R.C. 2151.414(D)(1) and 2151.414(D)(2), the second requirement for granting permanent custody of K.M. and T.M. to FCCS is met. R.C. 2151.414(B)(1). Overall, upon a thorough consideration of the record, we find clear and convincing evidence exists to support the trial court's determination that an award of permanent custody to FCCS is in K.M. and T.M's best interest and the decision was not against the manifest weight of the evidence. Accordingly, appellant's assignment of error to the contrary lacks merit and is overruled.

## IV. Conclusion

{¶ 58} Having overruled appellant's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

LUPER SCHUSTER and BOGGS, JJ., concur.

————————————