[Cite as *In re C.L.*, 2025-Ohio-2078.]

IN THE COURT OF APPEALS OF OHIO

TENULNTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| | | No. 23AP-607 |
| C.L., | : | (C.P.C. No. 21JU-9672) |
| [H.L., Mother, | : | (REGULAR CALENDAR) |
| Appellant]. | : | |

D E C I S I O N

Rendered on June 12, 2025

**On brief:** *Mitchell A. Williams*, Public Defender, and *Timothy E. Pierce*, for appellant.

**On brief:** *Robert J. McClaren*, *Sharon Carney*, and *Erin L. Burton*, for appellee.

APPEAL from the Franklin County Court of Common Pleas
Division of Domestic Relations and Juvenile Branch

JAMISON, P.J.

{¶ 1}    Appellant, H.L., mother of the minor child, C.L., appeals the decision of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch, granting permanent custody of C.L. to Franklin County Children Services ("FCCS"), a public children services agency.  For the reasons below, we affirm.

**I. FACTS AND PROCEDURAL HISTORY**

{¶ 2}    C.L. was born on December 26, 2020.  C.L.'s biological father is unknown.  At the time of C.L.'s birth, H.L. tested positive for cocaine.  H.L. reported that she was selling cocaine.  She stated she handled the cocaine without gloves and tested the cocaine by putting it on the tip of her tongue.

{¶ 3}    On January 5, 2021, H.L. signed a voluntary custody agreement with FCCS.  H.L. reported that she was still selling cocaine and testing her product.  C.L. was placed

with A.L., H.L.'s adult daughter. On January 19, 2021, H.L. again tested positive for cocaine. FCCS learned on January 22, 2021, that H.L. and A.L. were not abiding by the voluntary custody agreement. It was alleged that C.L. had been staying with H.L. Furthermore, C.L.'s basic needs were not being met and she was not gaining weight appropriately. C.L. was removed from A.L.'s care in April of 2021 and placed into foster care. She was moved to her present foster care home in July of 2021.

{¶ 4} On October 4, 2021, FCCS filed a complaint alleging that C.L. was a dependent child. The complaint summarized H.L.'s extensive history with FCCS regarding her other children, including one child that was in FCCS's permanent custody. It also alleged that H.L.'s whereabouts were unknown. The complaint detailed C.L.'s progress in her foster home and H.L.'s lack of progress on her case plan. The complaint sought an order of temporary custody to FCCS.

{¶ 5} Following a preliminary hearing on October 5, 2021, C.L. was placed in the interim temporary custody of FCCS. Visits with the child were ordered to be supervised. H.L. was ordered to submit to random drug screens and obtain an alcohol/drug assessment.

{¶ 6} An adjudication hearing was held on November 23, 2021. H.L. did not appear for the hearing. The magistrate found C.L. to be a dependent child and committed her to the temporary custody of FCCS. The magistrate also approved and adopted the case plan.

{¶ 7} On January 24, 2022, FCCS filed a motion for the court to issue an order granting FCCS permanent custody of C.L. In its motion, FCCS alleged, pursuant to R.C. 2151.414(B)(1)(a), that the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

{¶ 8} On May 19, 2022, C.L.'s Guardian ad Litem ("GAL") filed a report recommending that FCCS be granted permanent custody of the child. However, in July of 2022, the current GAL withdrew, and a new GAL was appointed. On September 13, 2022, November 21, 2022, and March 13, 2023, the new GAL filed reports recommending that C.L. remain in the temporary custody of FCCS.

{¶ 9} On June 27, 2023, a visiting judge was appointed to preside over the proceedings in this matter.

{¶ 10} The new GAL filed a report on August 14, 2023, recommending that C.L. be placed in the permanent custody of FCCS.

{¶ 11} A hearing on FCCS's motion for permanent custody was held on August 21, 2023. H.L. did not appear for the hearing. Prior to the hearing, her last contact with her attorney was an email on March 6, 2023. Her last contact with the GAL was a text message on May 30, 2023.

{¶ 12} FCCS presented the testimony of three witnesses.

{¶ 13} Casey Barrett testified that she was the FCCS caseworker for C.L. from September of 2022 until August 7, 2023. Barrett testified that the child tested positive for cocaine at birth. FCCS opened a voluntary case with H.L., and she agreed to a safety plan. H.L. agreed to give FCCS custody of C.L. on January 5, 2021. FCCS obtained temporary custody through the court on February 2, 2021. After that, C.L. remained in FCCS's temporary custody until the date of the hearing on FCCS's permanent custody motion.

{¶ 14} The same case plan was in place throughout the pendency of this matter. As part of that case plan, H.L. was required to 1) submit to random drug screens, 2) obtain a mental health assessment, 3) obtain an alcohol and drug assessment, 4) follow all recommendations of the assessments, 5) visit with C.L., 6) have a legal source of income and provide proof to FCCS, 7) complete a parent mentoring course, and 8) submit to a psychological evaluation. After November of 2022, despite efforts to contact H.L., Barrett had no contact with H.L. except for a few emails in December of 2022. H.L.'s last visit with C.L. was March 10, 2022, and her visitation prior to that was inconsistent. There was no evidence that H.L. completed an alcohol and drug assessment or that she submitted to random drug screens. H.L. did not complete a parent mentoring course. FCCS was not provided any evidence that H.L. had a legal source of income. There was no evidence that H.L. completed a psychological evaluation. As of June 2023, the last known address for H.L. was an extended stay hotel, but at the time of the hearing, FCCS was unable to confirm where she was living. H.L. never participated in any semi-annual reviews.

{¶ 15} Barrett testified that C.L.'s current foster parent indicated that she was willing to adopt C.L. Barrett visited C.L. in her foster home twice per month and C.L. appeared very bonded with her foster mother. C.L. has diagnoses of Autism and global developmental delays. She is non-verbal. She requires substantial daily care, including

frequent medical appointments. C.L.'s foster mother ensures that her basic and special needs are met. Barrett testified that no other family members have come forward interested in caring for C.L.

{¶ 16} C.L.'s ongoing FCCS caseworker, Jessica Crist, testified that she became C.L.'s caseworker on August 14, 2023. At the time of the hearing, she had not had any contact with H.L. She did not have a good address for H.L. and there was no alleged father for C.L. To her knowledge, H.L. had not participated in any of C.L.'s therapies or medical appointments and had not made progress on her case plan.

{¶ 17} Taylor Sharkey, C.L.'s GAL, also testified. She was C.L.'s second GAL and was appointed on July 26, 2022. Sharkey had sporadic contact with H.L. Sharkey's last visit with H.L. was January 18, 2023. Sharkey believed that she had a good phone number for H.L. because H.L. responded to a text message in May of 2023. Sharkey's last visit was at H.L.'s residence on East 26th Avenue. At the time, two younger children and two adult children were living at the house. Sharkey indicated that even though there were younger children in H.L.'s home at the last visit, Sharkey still believed permanent custody to FCCS to be in C.L.'s best interest because of C.L.'s severe special needs. Sharkey also had concern for H.L.'s lack of progress on her case plan, especially regarding her mental health. Additionally, Sharkey was unable to assess her current living situation because H.L. was no longer living in the house on East 26th Avenue.

{¶ 18} Sharkey observed C.L. in her foster home. C.L. was very attached to her foster mother. The foster mother had a special way of calming C.L. down when she had behavioral issues. In Sharkey's last conversation with the foster mother, she was on the fence about adopting C.L. Ultimately, Sharkey believed that permanent custody to FCCS was in C.L.'s best interest.

{¶ 19} At the conclusion of the hearing, the trial court granted FCCS's motion for permanent custody and articulated it's reasoning for its ruling.

{¶ 20} On September 6, 2023, FCCS submitted proposed findings of fact and conclusions of law to the court. Those were adopted in a decision and judgement entry, dated September 22, 2023. C.L. was ordered to be placed in the permanent custody of FCCS.

{¶ 21} H.L. now brings this appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 22} H.L. assigns the following as trial court errors:

[1.] The court's decision in granting the PCC motion was not supported by sufficient evidence and ran against the manifest [weight] of the evidence.

[2.] By failing to specify which R.C. 2151.414(D)(2)(a)/2151.414(E) findings he believed the agency had proven by clear and convincing evidence the trial judge undermined this Court's ability to engage in meaningful appellate review of the journalized ruling sustaining the PCC motion.

[3.] The Trial court's verbatim adoption of the agency's September 6, 2023 proposed findings of facts and conclusions of law indicates it did not consider the entirety of the record and arguments of the parties when it sustained FCCS's PCC motion.

## III. STANDARD OF REVIEW

{¶ 23} It is well-established that a parent's right to raise a child "is an 'essential' and 'basic civil right.' " *M.S.K. v. C.K.*, 2016-Ohio-5046, ¶ 8 (10th Dist.), quoting *In re Murray*, 52 Ohio St.3d 155, 157 (1990). The "[p]ermanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' " *In re Hoffman*, 2002-Ohio-5368, ¶ 14, quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991). Based upon these principles, the Supreme Court of Ohio has determined that a parent " 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith* at 16. A parent's rights, however, are not absolute. *In re B.L.*, 2005-Ohio-1151, ¶ 7 (10th Dist.).

{¶ 24} "In reviewing a judgment granting permanent custody to FCCS, an appellate court 'must make every reasonable presumption in favor of the judgment and the trial court's findings of facts.' " *In re J.T.*, 2012-Ohio-2818, ¶ 8 (10th Dist.), quoting *In re P.G.*, 2012-Ohio-469, ¶ 37. An appellate court will not reverse a trial court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence. *In re H.D.*, 2014-Ohio-228, ¶ 8 (10th Dist.). Clear and convincing evidence is more than a mere preponderance of the evidence and must "produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established."

*In re K.L.*, 2013-Ohio-3499, ¶ 14 (10th Dist.). "It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt." *Id.*

{¶ 25} R.C. 2151.414(B) establishes the analysis that the trial court must apply when ruling on a motion for permanent custody. The trial court must determine whether the following applies: a) ". . . the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." R.C. 2151.414(B)(1)(a). "In determining . . . whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence." R.C. 2151.414(E). "If the court determines, by clear and convincing evidence, . . . that one or more of the [factors listed in R.C. 2151.414(E)(1) through (16)] exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." *Id.*

{¶ 26} Once the trial court makes that finding, it must determine if granting the motion for permanent custody is in the child's best interest. In making that determination, the trial court is to consider all relevant factors, including, but not limited to, the factors listed in R.C. 2151.414(D)(1)(a) through (e). R.C. 2151.414(D)(1). Pursuant to R.C. 2151.414(D)(2), "[i]f all of the following apply, permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency:" a) clear and convincing evidence demonstrates that one or more factors listed in R.C. 2151.414(E)(1) through (16) exist and the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; b) the child has been in the agency's custody for at least two years; c) the child is ineligible for a Planned Permanent Living Arrangement ("PPLA"); and d) no relative or other interested party has filed for legal custody of the child.

{¶ 27} Sufficiency of the evidence is a test of adequacy to determine if the evidence is legally sufficient to sustain a decision. This is a question of law to be reviewed de novo by this court. *In re J.V.*, 2012-Ohio-4961, ¶ 3. This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented. *In re K.A.*, 2016-Ohio-7911, ¶ 10 (12th Dist.). However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may

nevertheless conclude that the judgment is against the manifest weight of the evidence." *In re T.P.*, 2016-Ohio-72, ¶ 19.

{¶ 28} As with all challenges to the manifest weight of the evidence, in determining whether a juvenile court's decision is against the manifest weight of the evidence in a permanent custody case, an "appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re K.M.*, 2024-Ohio-2137, ¶ 34 (10th Dist.).

{¶ 29} On appellate review, "[p]ermanent custody motions supported by some competent, credible evidence going to all the essential elements of the case will not be reversed . . . as against the manifest weight of the evidence." *In re Brown*, 2004-Ohio-3314, ¶ 11 (10th Dist.). Further, in determining whether a judgment is against the manifest weight of the evidence, the reviewing court is guided by the presumption that the findings of the trial court are correct. The underlying rationale of giving deference to the findings of the trial court rests with the understanding that the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *In re S.R.*, 2006-Ohio-4983, ¶ 38 (10th Dist.). "In proceedings involving the custody and welfare of children the power of the trial court to exercise discretion is peculiarly important. The knowledge obtained through contact with and observation of the parties and through independent investigation cannot be conveyed to a reviewing court by printed record." *In re A.H.*, 2021-Ohio-1040, ¶ 30 (10th Dist.).

{¶ 30} Thus, we must look to the entire record to determine whether the trial court had sufficient evidence before it to clearly and convincingly find that it was in the minor child's best interest to terminate the parental rights and award permanent custody to FCCS.

{¶ 31} Pursuant to R.C. 2151.414(C), "[i]f the court grants permanent custody of a child to a movant under this division, the court, upon the request of any party, shall file a written opinion setting forth its findings of fact and conclusions of law in relation to the proceeding."

## IV. LEGAL ANALYSIS

{¶ 32} In her first assignment of error, H.L. alleges that the trial court's decision granting FCCS's motion for permanent custody was not supported by sufficient evidence and was against the manifest weight of the evidence. H.L. contends that FCCS failed to set forth clear and convincing evidence that its motion for permanent custody should be granted.

{¶ 33} A review of the record reveals that the trial court's decision was supported by clear and convincing evidence. In granting FCCS's motion for permanent custody, the trial court found that R.C. 2151.414(D)(2) applied. Under that subsection, permanent custody is in the child's best interest and the trial court *must* grant permanent custody to the agency if four factors are met. *K.M.*, 2024-Ohio-2137, at ¶ 38 (10th Dist.). First, the trial court must determine by clear and convincing evidence that one or more of the factors in division (E) of R.C. 2151.414 exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent. R.C. 2151.414(D)(2)(a). Only one of the factors enumerated in R.C. 2151.414(E) need be met. *B.L.*, 2005-Ohio-1151, at ¶ 30 (10th Dist.).

{¶ 34} In this case, the trial court found that the following R.C. 2151.414(E) factors applied: the parent failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home; chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year of the hearing; the parent demonstrated a lack of commitment to the child; and the parent is unwilling to provide food, clothing, shelter, and other basic necessities for the child, or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

{¶ 35} H.L. contends that the evidence shows she substantially remedied the conditions that caused C.L.'s removal from her custody and substantially complied with her case plan. In support of these arguments, H.L. contends that FCCS failed to set forth any evidence that she was still using or selling illegal substances. H.L. also alleges that the record shows that when she visited C.L., the visits went well. H.L. completed an alcohol treatment program at Ohio State University ("OSU") in August of 2020. She also reported

that she completed an alcohol and drug assessment and obtained a legal source of income. Finally, H.L. points out that during several of the GAL visits, there were other children she cared for in her home.

{¶ 36} As to H.L.'s contention that she substantially remedied the conditions that caused C.L.'s removal, that is belied by the record. H.L. argues that FCCS failed to produce evidence that she was still using or selling illegal substances. Although this is true, it is a result of H.L.'s limited contact with the caseworkers and failure to submit any proof that she completed any case plan objectives regarding her use and/or sale of narcotics.

{¶ 37} C.L. initially came into FCCS's custody due to H.L. using and selling cocaine. Despite FCCS's efforts, the evidence shows that the last contact H.L. had with her caseworker was a few emails in December of 2022, approximately nine months prior to the permanent custody hearing. H.L. signed releases of information, but FCCS received no proof that H.L. submitted to drug screens or engaged in drug treatment. In fact, H.L. did not submit to any drug screens after January of 2021. Thus, there was no evidence to show H.L. remedied the substance abuse concerns that caused C.L.'s removal from the home.

{¶ 38} Furthermore, the record does not support H.L.'s contention that she substantially complied with her case plan. As part of her case plan, H.L. was required to submit to random drug screens; obtain mental health and alcohol/drug assessments and follow the recommendations; obtain legal income and show FCCS proof; visit with C.L.; obtain a psychological evaluation; and complete a parent mentoring course. Although H.L. initially exercised her visitation with C.L., at the time of the permanent custody hearing, her last visit with C.L. was March 10, 2022. H.L. claimed that she had a legal source of income and completed alcohol and drug assessments, but never provided FCCS with proof. H.L. completed a mental health assessment on January 10, 2022, and was diagnosed with PTSD, but she was unsuccessfully discharged from counseling in February of 2022. (May 19, 2022 GAL Report at 2.) H.L.'s completion of the OSU alcohol program was in August of 2020, prior to C.L.'s birth. H.L. failed to submit to random drug screens, obtain a psychological evaluation, and complete a parent mentoring course.

{¶ 39} Based on the foregoing, the record demonstrates that the trial court's determination that H.L. had not substantially remedied the conditions causing C.L.'s

removal was supported by clear and convincing evidence. Furthermore, the evidence shows that H.L. did not substantially comply with her case plan.

{¶ 40} The trial court also found that H.L. suffered from chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency that was so severe it made her unable to provide C.L. an adequate permanent home at the present time or within one year of the permanent custody hearing. The record demonstrates that H.L.'s case plan objectives included mental health and drug treatment. H.L. received a mental health assessment in January of 2022, and she was diagnosed with PTSD. However, she was unsuccessfully discharged from counseling the following month. Furthermore, this case began with H.L. testing positive for cocaine at C.L.'s birth. During the pendency of this case, H.L. did not submit to drug screens, did not submit proof that she obtained an alcohol and/or drug assessment, and did not successfully complete drug treatment. Thus, in the nearly three years that FCCS was involved with C.L., H.L. failed to complete any treatment that addressed her mental health and drug issues. It follows that there is clear and convincing evidence that H.L. was suffering from chronic mental illness and chemical dependency that prevented her from providing C.L. with the care she needed within one year of the permanent custody hearing.

{¶ 41} As to H.L.'s demonstrated lack of commitment to C.L., at the time of the hearing, H.L.'s last contact with C.L. was a visit on March 10, 2022, nearly one and one-half year before the permanent custody hearing. There was no evidence that H.L. provided anything for the care of C.L. while she was in FCCS's temporary custody. C.L. has severe special needs and often requires multiple appointments per week. H.L. never attended these appointments. Additionally, there was no evidence that H.L. attempted to learn how to care for C.L.'s special needs. At the time of the hearing, none of the parties could confirm where H.L. was living. She was no longer living on East 26th Avenue. Some evidence suggested that she was residing at an extended stay motel at Tuttle Crossing, but neither FCCS nor the GAL were able to confirm that information. It should also be noted that H.L. never appeared for any hearings in this matter. Based on the foregoing, there was clear and convincing evidence that R.C. 2151.414(E)(4) applied in this case. *See K.M.*, 2024-Ohio-2137, at ¶ 42 (10th Dist.) (R.C. 2151.414(E)(4) met where parent had inconsistent visitations with child, failed to remedy unstable housing situation, failed to attend child's medical

appointments, refused to submit to drug screens, and failed to provide proof of employment).

{¶ 42} The trial court also found that H.L. was unwilling to provide food, clothing, shelter, and other necessities for C.L., or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect. R.C. 2151.414(E)(14). The evidence demonstrated that H.L. failed to address her mental health and drug dependency issues, never provided FCCS proof that she had a legal source of income, failed to demonstrate she had safe and stable housing, and failed to visit with C.L. in the year and one-half preceding the hearing. There was no evidence that C.L. tried to provide for the basic needs of C.L. while she was in FCCS's temporary custody. Significantly, H.L. never attended C.L.'s medical appointments and never attempted to learn how to care for C.L.'s extensive medical needs. It follows that there was clear and convincing evidence that R.C. 2151.414(E)(14) applied in this case.

{¶ 43} Despite only needing to prove the presence of one of the R.C. 2151.414(E) factors, FCCS presented clear and convincing evidence to show the presence of at least four. Thus, the trial court did not err in determining that C.L. cannot or should not be returned to the custody of the parents within a reasonable amount of time.

{¶ 44} Having found the first factor of R.C. 2151.414(D)(2) was met, we must determine whether the remaining three factors were satisfied. In this matter, those factors were undisputed. C.L. was in FCCS's continuous custody from the end of January of 2021 until the permanent custody hearing in August of 2023. This is well over two years and satisfies R.C. 2151.414(D)(2)(b). At the time of the hearing, C.L. was only three years old and ineligible for a PPLA. R.C. 2151.414(D)(2)(c). Finally, prior to the hearing, no relative or other interested person filed for legal custody of C.L. R.C. 2151.414(D)(2)(d).

{¶ 45} Based on the foregoing, the trial court's granting of FCCS's motion for permanent custody was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶ 46} Thus, we overrule H.L.'s first assignment of error.

{¶ 47} We will address H.L.'s second and third assignments of error together because they are related. In her second assignment of error, H.L. contends that the trial court erred in failing to specify which R.C. 2151.414(E) factors it found applied in this case.

In her third assignment of error, H.L. contends that the trial court erred in adopting, verbatim, FCCS's proposed findings of fact and conclusions of law.

{¶ 48} Initially, it should be noted that R.C. 2151.414(C) states that "[i]f the court grants permanent custody of a child to a movant under this division, the court, upon the request of any party, shall file a written opinion setting forth its findings of fact and conclusions of law in relation to the proceeding." Here, H.L. did not request the trial court issue written findings of fact and conclusions of law. Thus, the trial court was not required to do so. *In re Day*, 2001 Ohio App. LEXIS 525, *18 (10th Dist. 2001); *In re Denny*, 2000 Ohio App. LEXIS 3418, *17-18 (5th Dist. 2000).

{¶ 49} Furthermore, the trial court's failure to articulate the applicable R.C. 2151.414(E) factors in its written decision did not undermine our ability to engage in meaningful appellate review. The trial court's written decision made the required finding that C.L. could not and/or should not be returned to the custody of H.L. within a reasonable amount of time. (Sept. 22, 2023 Decision & Jgmt. Entry at 3.) This, coupled with the trial court's oral pronouncement at the hearing about which R.C. 2151.414(E) factors applied, allowed this court to thoroughly review the decision regarding FCCS's motion for permanent custody. (Aug. 21, 2023 Tr. at 82.); *see In re J.R.*, 2024-Ohio-5619, ¶ 20 (trial court's lack of specificity in judgment entry not an error where the written decision, along with the trial court's comments on the record, demonstrated it considered the required factors).

{¶ 50} H.L. further argues that the trial court erred when it adopted verbatim FCCS's proposed findings of fact and conclusions of law. She contends that this demonstrates that the trial court failed to engage in the required analysis. However, the trial court's oral ruling immediately after the presentation of the evidence shows that it engaged in the necessary analysis. (Tr. at 79-83.) The trial court cited to specific testimony and statutory sections in orally granting FCCS's motion. The fact that the trial court subsequently adopted FCCS's proposed findings of fact and conclusions of law does not prove that it failed to engage in the necessary analysis. "It is not per se error for a trial court to adopt, verbatim, a party's proposed findings of fact and conclusions of law. . . . Error can only be found in such a case when the findings of fact and/or conclusions of law adopted by the trial court are against the manifest weight of the evidence." *Gerson v. Parma VTA, L.L.C.*, 2018-Ohio-2185, ¶ 68

(8th Dist.). As previously discussed, the trial court's decision was not against the manifest weight of the evidence. There was an overwhelming amount of evidence supporting the trial court's decision.

{¶ 51} Based on the foregoing, we overrule H.L.'s second and third assignments of error.

## V. CONCLUSION

{¶ 52} Having overruled each of H.L.'s three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch.

*Judgment affirmed.*

BEATTY BLUNT and DINGUS, JJ., concur.

————————————